# SUPPLEMENTAL APPENDIX

A.     Order of the Hon. Edith Brown Clement Carrying Appellant's Motion To Strike with Fifth Circuit Case No. 14-50093.

B     Appellant's Expedited Amended Motion To Strike Responding Brief in Fifth Circuit Case No. 14-50093 (including "Warranty Deed With Vendors Lien" From Edward Bravenec to Torralba Properties attached as Exhibit C).

C.     Appellant's Rule 28(j) Letter Citing Unpublished Cases.

FILED
IN THE COURT OF APPEALS
AT SAN ANTONIO, TEXAS
2015 JAN 30 PM 4:32
KEITH E. HOTTLE, CLERK



IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 14-50093

---

ROWLAND J. MARTIN, JR., Successor in Interest to Moroco Ventures
L.L.C.,

Plaintiff - Appellant

v.

EDWARD BRAVENEC, Esquire; LAW OFFICE OF MCKNIGHT AND
BRAVENEC; 1216 WEST AVENUE, INCORPORATED,

Defendants - Appellees

---

Appeal from the United States District Court for the
Western District of Texas, San Antonio

---

O R D E R :

IT IS ORDERED that appellant's motion to strike appellee's brief
is CARRIED WITH THE CASE.

IT IS FURTHER ORDERED that appellant's motion to strike portions
of appellee's record excerpts, Tab #13 is CARRIED WITH THE CASE.

/s/ Edith Brown Clement
EDITH BROWN CLEMENT
UNITED STATES CIRCUIT JUDGE



Case No. 14-50093

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

ROWLAND J. MARTIN, JR.,
Successor in Interest to Moroco Ventures, L.L.C.,

Plaintiff-Appellant

v.

EDWARD BRAVENEC, Esq.; THE LAW OFFICE OF MCKNIGHT AND
BRAVENEC; 1216 WEST AVENUE INCORPORATED,

Defendant - Appellees

Appeal From The United States District Court
For The Western District Of Texas, San Antonio Division

APPELLANT'S EXPEDITED AMENDED MOTION TO STRIKE

TO THE U.S. COURT OF APPEALS FOR THE FIFTH CIRCUIT:

Comes Now Rowland J. Martin, Appellant, pursuant to 28 U.S.C. 1291, the

Texas Citizens Participation Act (TCPA), and F.R.A.P. 38 and 42, and files this,

his *"Expedited Amended Motion To Strike,"* for a partial take nothing judgment of

dismissal to permanently enjoin enforcement of Appellees' writ of execution.

STATEMENT OF THE CASE

Appellant hereby amends his motion to strike, incorporating by reference all

evidence and argument in the earlier motions, to request the Court to take notice

1

that Appellees' pleading styled as a "Responding Brief" exhibits a want of timely prosecution cognizable under Rule 42, and due to its inclusion of a request for affirmative relief unsupported by a timely notice of cross appeal. 28 U.S.C. 1291. *See, Exhibit A.*[1] In fact, their so-called brief was preceded by an earlier pleading that expressly disavowed appellate jurisdiction over the same subject matter of their pending request for affirmative relief. *See, Exhibit B.* [2] Given the history of the federal and state court litigation, the pleading comes within the sphere of the Texas Citizen's Participation Act (TCPA) due to its interrelationship with a pending Anti-SLAPP interlocutory appeal, and due to the fact that the filing of a notice of lis pendens has been held to constitute an exercise of the right to petition

---

[1]     On or about August 14, 2014, the Clerk notified Appellees that the deadline for filing their Responding Brief had passed. Appellees' then filed a Responding Brief in Fifth Circuit Case No. 14-50093 in September 2014 - relying on the same knowledge that they had on March 20, 2014 - only this time admitting that on March 5, 2014 the District Court had expressly disavowed rather than asserted federal jurisdiction to impose sanctions and findings of contempt, thus categorically repudiating the veracity of their earlier contentions about a finding of contempt in Case No. SA 11-CV-0414. The Fourth Court of Appeals later issued an order on December 8, 2014 explaining that the state court appeal in Case No. 04-14-00483-CV triggered an automatic stay upon the filing of notices of appeal from orders denying Appellant TCPA motion to dismiss on July 9, 2014 and July 17, 2014. See Rule 28(j) Letter #2 ("Letter #2).

[2]     On March 20, 2014, the Appellee Law Office of McKnight and Bravenec filed a *"Response To Appellant's Motion To Recall And Revise The Mandate"* in this Court in which they refer to a March 19, 2014 probate court hearing. In this earlier pleading, they flatly deny that the Court had subject matter jurisdiction to conduct further review in Case No. 13-50070. The pleading states that "As the District Court noted in its Feb. 1, 2013, order, Mr. Martin wholly disregarded the Court's demand, failed to show cause, and should be held in contempt. Movant has filed four lis pendens on non-movant's property … Each has been subsequently expunged by the appropriate court." *Id. at para. 13.* " Appellees later corrected their malicious false statement to the Court in Case No. 13-50070 in the Responding Brief they filed in this case: " … the court denied Appellees' motion to expunge the third lis pendens [and for contempt] … because it found that it did not in fact have jurisdiction to do so." *Appellees' Responding Brief,* at *p. 7.*

within the meaning of the TCPA. *James, et al, v. Calkins*, Case No. 01-13-0018-CV (Tex. App. – Houston [1st Dist.] August 21, 2014) (lis pendens is covered by Anti-SLAPP laws of Texas).*[3] Equally important, Appellees transferred the subject property of their request for affirmative relief prior to filing their brief. Exhibit C; *but see, NRA v. McCraw*, Case No. 12-10091(5th Cir., 2013) (mootness).[4]

The mere consideration of Appellees' request for affirmative relief raises questions about Fifth and Fourteenth due process in Appellant's pending federal and state appeals.[5] Appellant requests the Court to dispose of the pleading as a non-justiciable legal action in the nature of an unauthorized counter-appeal, *Mohawk Industries, Inc. v. Carpenter*, 130 S. Ct. 599, 605-07 (2009) (Thomas, J., concurring at 609-12), and to grant a take nothing judgment of dismissal to enjoin

---

[3]     Unpublished cases noted with an asterisk appear in Appellants Rule 28(j) Letter submitted with the amended motion to strike.

[4]     Appellees' allegations in Fifth Circuit Case Nos. 13-50070 and 14-50093, in State District Court Case No. 2014-CI-07644, and in Fourth Court of Appeals Case No. 04-14-00483-CV, all respond to to lis pendens speech and seek to hinder Appellant's attempts to participate in government to the maximum extent permitted by law. As result, an interlocutory appeal was taken from the state court's denial of dismissal relief pursuant to the Texas Citizen's Participation Act on July 9, 2014 and July 17, 2014, and is docketed in the state appellate court as *Martin v. Bravenec*, Case 04-14-00483-CV. Following Appellant's TCPA notices of appeal, Appellee Bravenec then transferred the subject property to a third party pendent lite transferee on or about July 11, 2014. See Exhibits in Appellant's Rule 28(j) Letter #3 (hereafter "Letter #3").

[5]     "For the law to countenance … abrupt and shameless shift[s] of positions would give prominence (and substance) to the image that lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a search for truth … On balance, we conclude that the costs to the legal system of the assignment outweigh its benefits. We hold that an assignment … is invalid." *Zuniga v. Grose, Locke, & Hebdon*, 878 S.W. 2d 313, 318 (Tex. App. San Antonio 1994, writ ref'd).

enforcement of Appellees writ of execution in Case No. SA 11-CV-0414,

*Hornbeck Offshore Servs., L.L.C. v. Salazar*, No. 11– 30936, 2013 WL 1437675

(5th Cir. Apr. 9, 2013) (rejecting argument by beneficiary of sanctions order

because alleged violation involved separate post-order transaction). However, the

Court is requested to retain remedial jurisdiction to resolve whether the district

court's judgment manifest plain error by departing from the federal choice of law

doctrine in *Sampliner v. Motion Picture Patents Co.*, 254 U.S. 233 (1920), and to

review grievances about Appellees' motions for criminal contempt requesting

incarceration, a factor bearing on the public reputation of the entire proceeding.[6]

---

[6]     The district court's red herring treatment of grievances about Appellee Bravenec's
federal court motions for criminal contempt, and the question of whether this Court is obligated
apply jus cogens standards of judicial conduct from treaty law in disposing of the grievance, are
reserved and are expressly excluded from the proposed dismissal. Ordinarily, a lawyer for a party
who is a beneficiary of a court order cannot prosecute a contempt action alleging a violation of
that order, as the Law Office of McKnight and Bravenec was allowed to do for Edward Bravenec
in this case. *See, Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 804 (1987) (reversing
criminal contempt judgment against defendants found to have aided or abetted violations of
permanent injunction prohibiting infringement of manufacturer's trademark); *see also, Crowe v.
Smith*, 151 F. 3d 217, 227-28 (5th Cir. 1998) ("where criminal contempt is involved, there must
actually be an independent prosecutor of some kind, because the district court is not
constitutionally competent to fulfill that role on its own." ); *In re Davidson*, 908 F. 2d 1249,
1251 (5th Cir. 1990) (harmless error analysis in case of *Young* rule violation is inappropriate
because "counsel for a party that is the beneficiary of a court order may not be appointed as
prosecutor in a contempt action alleging a violation of that order" and because prosecution of
contempt charges by presiding judge is not an exercise of Article III judicial power); *Dunn v.
Koehring Co.*, 546 F. 2d 1193, 1203 (5th Cir. 1977) (noting a desire to see opposing personally
punished or to use  prosecution to gain  advantage in suit for breach of warranty"); and
*Brotherhood of Locomotive Firemen & Enginemen v. U.S.*, 411 F. 2d 312 (5th Cir. 1969)
(counsel for private parties should not be named to prosecute criminal contempt arising out of
civil case). See also, *Curtailing Freedom of Expression is not the Way to Combat Hateful
Speech*, United States comments to the CERD Committee, August 20, 2012 (In the early
nineteenth century "many states within the United States passed laws that made it illegal to

# ARGUMENT AND AUTHORITIES

A.   Appellees' Brought A State Court Legal Action To Enjoin Future
     Lis Pendens Speech, Sold Off The Property In The Lis Pendens
     Controversy, Then Requested Affirmative Relief In This Case.

The jurisdictional issue presented is whether collateral jurisdiction exists to grant Appellees request affirmative relief based on briefing arguments about a post hoc probate court order in a pleading unsupported by a timely notice of cross appeal. The collateral order doctrine originated in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546-47 (1949), and has been applied to non-final orders collateral to a final judgment that are final in effect. *Mohawk, Id.* As applied by the *Mohawk* court, the doctrine takes into account that permitting parties to undertake successive, piecemeal appeals of adverse rulings on matters of attorney-client privilege delays resolution of the underlying litigation and needlessly burdens the courts.[7] By extension, *Mohawk* limits collateral jurisdiction to grant affirmative relief on an untimely and unnoticed request because "the threshold for the use of inherent sanctioning power is high, and once the power is invoked, it must be

---

criticize slavery. Those who spoke out against slavery in public or in their writing were punished as criminals, often severely."); http://geneva.usmission.gov/2012.

[7]      In *Mohawk*, the Supreme Court withheld collateral jurisdiction to allow an appeal from a district court order adverse to a claim of attorney client privilege. *See, Will v. Hallock*, 546 U.S. 345, 350 (2006), and *Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867-68 (1994)); *see also*, Wright & Miller §3914.23, at123 ("Routine appeal from disputed [collateral] orders would disrupt the orderly progress of the litigation, swamp the courts of appeals, and substantially reduce the district court's ability to control the ... process."); cf. Cunningham v. Hamilton County, 527 U. S. 198, 209 (1999) (expressing concern about "piecemeal appeals and concomitant delays that the final judgment rule was designed to prevent").

'exercised with restraint and discretion.' " *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir.1995).

*Mohawk* strongly implies that the jurisdictional requirements of a timely notice of appeal and a justiciable controversy do not cease to apply to a respondent simply because a court of appeals has competent jurisdiction to conduct collateral review on an appellant party's timely notice of appeal. *Matta v. May*, 118 F.3d 410, 413-14 (5th Cir. 1997). Direct legal support for that conclusion is found in *Jones v. Beckman*, 2007 Cal. App. LEXIS 8326 (Cal. App., 2007),* where the respondent of an Anti-SLAPP motion in a California lis pendens case neglected to file a cross appeal, but purported to attack the lis pendens claimant's constitutional standing and the jurisdictional defects in the trial court's process. *Id. at p. 4.* The Court there ruled for the appellant lis pendens claimant:

> We reject this argument outright. [Respondent] has not filed a cross appeal and has not shown that review of this issue is necessary to decide whether any error asserted by appellants was prejudicial to them. Such a showing is required to bring her within the exception to the general rule that a respondent cannot obtain affirmative relief unless he or she files a cross appeal.

*Id.* The treatment of the cross appeal issue in *Jones* agrees with the jurisdictional rule of this Court that a claim is moot if it "presents no Article III case or controversy," such as when the counter-claimant lacks "a legally cognizable interest in the outcome," and in such cases, "a court has no constitutional jurisdiction to resolve the issues it presents." *McCraw, Id.*

6

Apply the case law above, it is clear that Appellees seek a federal court ruling on a probate-related matter which is unsupported by a cross appeal, that if rendered in their favor would have no practical effect on the controversy due to their transfer of the subject property, and that would directly interfere with a pending TCPA interlocutory appeal. There is no indication that Congress ever intended to give the Courts of Appeals power to review a category of proceedings such as this. *Mohawk, Id.*

Here, as in *Jones*, Appellees' pleading neither qualifies as a pure "Responding Brief," nor as a statutorily authorized "cross appeal," *Id.*, but can best be described as an ad hoc "counter-appeal" implicating the Anti-SLAPP laws of Texas. According *James* and in *McCraw*, moreover, Appellees' brief is moot. Like the teenagers who aged out their standing to render the appeal in *McCraw* moot, Appellees' standing to modify a jurisdictional determination by the district court has now expired because their sale vitiated whatever standing they might have had to prosecute a proper cross-appeal here. Further, Appellees sought affirmative relief in this Court after an automatic stay took effect under Section 51.014(b) of the Texas Civil Practice And Remedies Code comparable to the one in *Varian Medical Systems, Inc. v. Delfino*, 35 Cal. 4th 180, 192 (2005) *appealed in* Super. Ct. No. CV780187 (Cal. 2005), where the California Supreme Court held that the automatic stay triggered by the interlocutory appeal there divested the trial court's

7

plenary jurisdiction.[8] Appellees then subsequently failed to deny Appellant's contention that they received all the federal court relief that they were personally entitled to receive on December 4, 2013 when the district court expunged a lis pendens notice attached to *Martin v. Grehn*.

Thus, here as in *Mohawk, Id.,* Appellees' invitation to exercise collateral jurisdiction over their *de facto* counter-appeal fails to reflect "restraint and discretion" because the limited benefits of reviewing a probate court order referring to a non-party "simply cannot justify the likely institutional costs" of their piece-meal to disrupt a pending TCPA interlocutory appeal. The Court has good cause to decline collateral jurisdiction. *Mohawk* authorizes the Court to strike and dismiss the counter-appeal as a de novo legal action exceeding federal appellate jurisdiction provided in 28 U.S.C. 1291 without reversing the underlying judgment and related expunction of lis pendens on December 4, 2014. *Anderson v. Law Firm of Shorty, Dooley & Hall,* (E.D. La. Feb 17, 2010) affirmed in 393 Fed. Appx. 214 (5th Cir. Aug. 26, 2010) (applying "separate transaction rule" to affirm denial of sanctions).

---

[8]    In *Varian*, the California Court of Appeals held that a defendant's claim of a first amendment right to use of Internet bulletin boards to post derogatory messages about a former employer warranted enforcement of the common law rules against judicial prior restraints. On appeal, the California Supreme Court held that the denial of a special motion to strike automatically stays all further trial court proceedings, and that the defamation plaintiff was subject to sanctions under California's anti-SLAPP law.

**B. Appellees' Engaged In A Pattern Of Advocating Burdens On Speech That Fail To Withstand Scrutiny Under Any Standard That Might Plausibly Apply.**

The application of TCPA protections to lis pendens speech in *James* refutes the Appellees' denial that the lis pendens filing in question qualifies as protected speech for First Amendment purposes. The right of access to the courts stems from the First Amendment's right to petition the government , *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972), and from the American ideal that "the courthouse door is open to everyone," *NAACP v. Meese*, 615 F. Supp. 200, 205-06 (D.D.C. 1985). Though statutorily guaranteed under 28 U.S.C. § 1564 in the modern era, the origin of the right can be traced to medieval England and the Magna Carta. *Cf. United States v. The Libellants And Claimants Of The Schooner Amistad,* 40 U.S. 518, 10 L. Ed. 826 (1841).

In *James, Id.*, the plaintiffs brought tort cases against the defendant filing party of a lis pendens notice , and the state court of appeals resolved the dispute by reversing the trial court's order denying the defendant's motion to dismiss. *Id.* As such, *James* supplies a state law precedent for the conclusion that lis pendens notices fall within the scope of the freedoms protected by the TCPA:

> We agree that appellees' claims in the underlying case are "based on, relate[] to, or [are] in response to" appellants' exercise of the right to petition as defined by the TCPA. See id. §§ 27.001(4)(A)(i), 27.005(b). As pleaded, appellees' actual and constructive fraud and barratry claims are "based on, relate[] to, or [are] in response to" [the opposing parties'] allegedly fraudulently claiming that they represent [the beneficiary of guardianship] in

9

pleadings filed in various lawsuits. See id. § 27.005(b). Likewise, appellees' fraudulent lien claim is "based on, relates to, or is in response to" the lis pendens filed by [Appellant] with the Harris County clerk that gave notice of her claims against [Appellee] in the 61st District Court lawsuit, which seeks to cancel his transfer of [the beneficiary's] home to a trust controlled by him. See id. All of these are "communication[s] in or pertaining to a judicial proceeding." See id. § 27.001(4)(A)(i). Appellees argue that that these actions cannot be constitutionally protected, but the cases they cite do not apply the TCPA, or do not involve communications of the type at issue here. Accordingly, we hold that appellants met their initial burden to prove that appellees' legal action related to their exercise of the right of petition. See id. § 27.005(c).

The result in *James* is consistent with the analysis in *Rose v. Rothrock,* Case No. 08-3884 (E.D. Penn, 2009)*, where the district court upheld a lis pendens notice. and denied a motion to impose sanctions, although the Section 1981 plaintiff there asserted no property interest in the res other than an executory contract of sale.

Here, the separate transaction rule justifies post-judgment filing of lis pendens notices and lien claims on First Amendment grounds for reasons not unlike those followed in *James* and *Rose.* Appellant discerns doctrinal support for his lis pendens argument in the First Amendment analysis followed by the dissenting judges in *NRA v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,* 700 F.3d 185 (5th Cir. 2012). *BATF* suggests that a two-step inquiry has emerged as the prevailing approach to First Amendment issues: the first step is to determine whether the challenged law impinges upon a right protected by the guarantee of free speech —that is, whether the law regulates conduct that falls within the scope of the guarantee; the second step is to determine whether to apply intermediate or

10

strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny. *Id.* at p. 8.

Applying the first step, the district court's assessment held that the litigation in *Martin v. Grehn* served no purpose other than to waste judicial resources and to increase the litigation costs of the opposing parties. That assessment involves a value judgment directed toward the content of *Martin v. Grehn* as a manifestation of the views Appellant expressed in the judicial forum. Congress manifested an interest those views when it include Section 443 in the Bankruptcy Abuse And Consumer Protection Act of 2005 which "[d]irects the Small Business Administration to study and report to Congress on: (1) the factors that cause small businesses to become debtors in bankruptcy; and (2) how Federal bankruptcy laws can be made more efficient in assisting small businesses to retain their viability." The fruit of Appellant's search for truth on these points is that the use of purchase money transactions to acquire real estate for a single property company has significant risk management and asset protection benefits in cases where the small business investor has the opportunity to be heard. Without checks and balances to regulate state court proceedings in accordance with *jus cogens* standards of judicial conduct, single asset small businesses are vulnerable to devastating losses. [9]

---

[9]     See especially, 1st and 2nd U.S. Reservations, and Article 2, of the "International Convention To Eliminate All Forms Of Racial Discrimination (ICERD Treaty), 140 CONG. REC. S7634-02 (daily ed. 1994); see also, "Response Of Reliant Financial To Appellant's

11

These are undoubtedly subjects that lie squarely within the conception of First Amendment speech that this Court rightly championed in *BATF:*

> The very enumeration of the right takes out of the hands of government— even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them . . . . We would not apply an "interest-balancing" approach to the prohibition of a peaceful neo-Nazi march through Skokie. The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrongheaded views. . . And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use [speech] in defense of hearth and home.

*Id.* The state law scope analysis in *Cortez v. Johnston*, 378 S.W.3d 468 (Tex. App.—Texarkana 2012, pet. denied) agrees with the Court's conclusion in *BATF*.

*Cortez* involved a defamation suit where the plaintiff judge moved to seal the record of a deposition after embarrassing information about the judge was revealed. Said the *Cortez* court:

> None would argue that these documents are not embarrassing and offensive. Balanced against that, Cortez is clearly a public figure who is, at present, an elected official whose privacy rights are limited by virtue of his public status.... the case of *Nguyen v. Dallas Morning News, L.P.*, No. 2-06-298-CV, 2008 WL 2511183, at **4–6 (Tex. App.—Fort Worth 2008, no pet.) (mem. op.), is instructive and persuasive. There, the embarrassing details of sexual misconduct of a parochial school official directed at minors were

---

Motion To Recall The Mandate" in Exhibit A (covered matter under 1st U.S. reservation to ICERD Treaty expressing protected viewpoint celebrating cultural icons associated with Cross of Odin).

deemed of legitimate public concern and were thus unsealed, using an analogy to the tort of invasion of privacy. The legitimate public concern in *Nguyen* was arguably not as strong as in this case, which involves a publically elected member of the state judiciary ...

*Id.* Here as in *Cortez*, Appellant expressed viewpoints about the performance of the judicial branch of state government, the quality of legal services provided by the Law Office of McKnight and Bravenec, and suspected forum shopping in the court of the state court judge that approved the foreclosure sale in *Martin v. Grehn*.

According to the latter cases, there is no question that the expressive conduct for which Appellant was sanctioned lies within the scope of the First Amendment, no less so than a peaceful neo-Nazi march through Skokie. *James, Id; Farias v. Garza*, 426 S.W.3d 808 (Tex. App.—San Antonio 2014, pet. filed May 6, 2014) (statement about undue influence stemming from campaign contributions warranted TCPA coverage), and *Rocha v. Ahmad*, 662 S.W.2d 77 (Tex. App.--San Antonio 1983, no writ) (adjudicating constitutional disqualification challenge to state appeals court judge).

Applying *BATF's* second step, the question becomes what level of scrutiny to apply to the sanctions order the Appellees seek to have the Court uphold. Arguably, the sanctions order would fail to withstand scrutiny under any standard of review that might plausibly apply, but Appellees would certainly lose under the "scrupulous exactitude" standard of review applied by the Supreme Court in

13

*Stanford v. Texas*, 379 U.S. 476 (1965),[10] or the "clear and specific evidence"

standard of review mandated more recently by this Court in *Henry v. Lake Charles*

*American Press, LLC*, 566 F.3d 164 (5th Cir. 2009) and *Brown v. Wimberly*, 477

Fed. Appx. 214, 216, (5th Cir. 2012). Applying the latter, the sanction proceeding

Appellees seek to uphold is indistinguishable from a constitutionally

impermissible prior restraint. *Cf., Houston v. Hill*, 482 U.S. 451 (1987); *Gulf Oil*

*Co., Inc. v Bernard*, 452 U.S. 89 (1981).

In *Varian*, the California Supreme Court addressed a prior restraint fact

situation in an Anti-SLAPP automatic stay case:

> We do find merit in defendants' argument that the portion of the injunction
> prohibiting future speech is an impermissible prior restraint under both the
> state and federal constitutions ... A prior restraint is an administrative or
> judicial order that forbids certain speech in advance of the time the
> communication is to occur... 'Temporary restraining orders and permanent
> injunctions- i.e., court orders that actually forbid speech activities-are classic
> examples of prior restraints.' ... Prior restraints on pure speech are highly
> disfavored and presumptively a violation of the First Amendment... This is
> true even when the speech is expected to be of the type that is not
> constitutionally protected...

*Id.* Here as in *Varian,* the district court's sanctions orders on February 1, 2014 and

December 5, 2014 fail to withstand scrutiny, as invoked in Appellees' counter

appeal to excuse prior restraints, because they were administered on December 27,

---

[10]    ""[T]he use by government of the power of search and seizure as an adjunct to a system
for the suppression of objectionable publications is not new ... [H]istory indispensably teaches
... the constitutional requirement that warrants must particularly describe the 'things to be
seized' is to be accorded the most *scrupulous exactitude* when the 'things' are books, and the
basis for their seizure is the ideas which they contain... To hold otherwise would be false to the
terms of the [Bill of Rights], false to its meaning, and false to its history. " *Id.* (emphasis added)

14

2014 to strike pleadings defending lis pendens speech that had not even occurred when the Appellees originally filed their motion for sanctions. *Kinny v. Barnes*, Case No. 13-0043 (Tex. 2014).*[11] In evaluating state action affecting freedom of speech by way of the probate court order, moreover, courts "must give the benefit of any doubt to protecting rather than stifling speech." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469 (2007). Here, the benefit of the doubt militates toward extending protection because there could be no important governmental interest in a probate court expunction order if the district court lacked jurisdiction over probate subject matter as it admitted on March 5, 2014.

Assuming *arguendo* that the trial court's sanctions proceeding qualifies as a content-neutral time, place and manner regulation, *BATF* would allow it to be sustained only if it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Id. at p. 21.* In order to withstand intermediate scrutiny, a scheme must be reasonably adapted to achieve an

[11]    In *Kinney*, the plaintiff sought a permanent injunction preventing the defendant from further making further defamatory statements and making the defendant remove defamatory statements. Texas courts had already ruled temporary injunctions preventing additional defamatory statements were unconstitutional prior restraints of free speech. The Supreme Court of Texas clarified: "We hold that, while "a permanent injunction requiring the removal of posted speech that has been adjudicated defamatory is not a prior restraint, an injunction prohibiting future speech based on that adjudication impermissibly threatens to sweep protected speech into its prohibition and is an unconstitutional infringement on Texans' free-speech rights under Article I, Section 8 of the Texas Constitution." A past injunction should not limit an individual's freedom to make the same or similar statements in the future because, "[g]iven the inherently contextual nature of defamatory speech…the same statement made at a different time and in a different context may no longer be actionable."

15

important government interest: "[t]he justification must be genuine, not hypothesized or invented post hoc in response to litigation," or relying "on overbroad generalizations." *NRA v. McCraw*, Id. at p. 12.

Construed as a content-neutral action that was intended sanction the lis pendens notice attached to *Martin v. Grehn*, the order below fails to withstand intermediate scrutiny. The withdrawal of the lis pendens notice prior to the December 5th order rendered moot the only lis pendens controversy which the district court had original jurisdiction to adjudicate. Nonetheless, the December 5th order proceeded as if Appellant had previously been enjoined from lis pendens filings, when in fact the order on the original January 2013 lis pendens notice merely declared the notice expunged. The district court's willingness to entertain sanctions restricting future speech, while disregarding legitimate grievances about motions for criminal contempt requesting incarceration, smacks of unthinkable "class-based abridgement of speech." *BATF, Id.* at p. 23. Thus, intermediate scrutiny supports the conclusion that speech advocating *jus cogens* standards of judicial conduct is constitutionally protected for TCPA purposes.[12]

---

[12]    A series of recent federal cases take notice of litigation advocating recognition of "specific, universal, and obligatory" duty to afford access to the courts for violations of international law and the law of nations that occur in the territorial United States. *Sarei v. Rio Tinto, PLC,* __ S. Ct. ____, (April 23, 2013) remanding 2011 WL 5041927 (9th Cir. Oct. 25, 2011), and *citing Kiobel v. Royal Dutch Petroleum Company*, Case No. 10–1491 (April 17, 2013), and *Morrison v. Nat'l Australian Bank, Ltd.,* 130 S.Ct. 692 (2010). *See also, Khulumani v. Barclay Nat'l Bank Ltd.,* 504 F.3d 254, 260 (2d Cir. 2007) (noticing ICERD Treaty as evidence

16

Appellees' construction of the sanctions order cannot even survive rational relationship scrutiny. *Wallace v. Kelley*, 2007 U.S. Dist. LEXIS 56472 (D. Neb. Aug. 1, 2007).* In *Wallace*, a federal court sanctioned pro se litigants for filing notices of lis pendens after dismissing their racketeering claims against a mortgage backed securities trust defendant, and after related state court proceedings to approve the sale of the subject properties had concluded. The dispositive factor there was the filing of the offending lis pendens for the first time after the case had been finally dismissed. [13] Here, it is not clear how filing a lis penden notice while federal court litigation is pending, and the withdrawal of the notice at the conclusion, manifests a propensity to engage in frivolous litigation or anything other than past reliance on a legal theory the district court disapproved. [14] Thus, the district court's reference to Appellant's supposed "propensity" confirms that suppressing future speech was the sole object of the sanctions proceeding.

---

of specific, universal and obligatory prohibition of systemic racial discrimination under the prevailing law of nations.)

[13] *Wallace, Id.* (noting that the plainitffs failed to allege that defendants engaged in conduct of an enterprise through a pattern of racketeering activity.) *Wallace* is discussed at length in "The Split on Sanctioning Pro Se Litigants Under 28 U.S.C. § 1927: Choose Wisely When Picking a Side, Eighth Circuit," at http://law.missouri.edu/lawreview/files/2012/11/Whitt.pdf ("[w]hen the Eighth Circuit decides whether 28 U.S.C. § 1927 may be applied to pro se litigants, it should choose the position with textual support, the position that meets Congress' intent, and the position that achieves the proper policy result.").

[14] *Nueces County, Texas v. Merscorp Holdings, Inc., et al.*, No. 2:12-CV-00131 (S.D. Tex., 2013) (litigating mortgage servicer fraud issue), and *Amalfitano v Rosenberg*, 428 F Supp 2d 196 (S.D. .N.Y., 2006), appealed to 2nd Circuit in 533 F3d 117, 125 (2d Cir., 2008), and certifying question to the state court of appeals in 12 NY3d 8 (N.Y. App., 2009) (detrimental reliance is not a mandatory element for a claim of chronic delinquent conduct by an attorney under Statute of Westminster).

C.     **A Waiver Of Sanctions Is Justified By A Plausible Federal Common Law Justification For Appellant's Line Lis Pendens Filings Which Demonstrates The Absence Of An Improper Purpose.**

"The danger that speech-restricting injunctions may serve as a powerful means to suppress disfavored views is obvious ... *even when they are based on a completed or impending violation of law.*" *Lawson v. Murray,* 515 U.S. 1110, 1114 (1995) (Scalia, J) (emphasis added). This is because "... a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive." *Houston v. Hill,* 482 U.S. 451 (1987). For this reason, the Texas Supreme Court recently held in *Kinney* that a past injunction should not limit an individual's right to free speech in the future, because "the same statement made at a different time and in a different context may no longer be actionable. Untrue statements may later become true; unprivileged statements may later become privileged." *Kinney, Id. at p. 17.*

The survival of protected interests in speech and the right to petition here requires reference to federal common law to fill a gap in the statutory scheme bearing on whether the district court's assumptions about unprivileged speech in Case No. 13-50070 govern the collateral review here in Case No. 14-50093. *Coop. Benefit Adm'rs, Inc. v. Ogden,* 367 F.3d 323, 329-30 (5th Cir. 2004). The source of the gap under 28 U.S.C. 1291 is Appellees' unsupported counter-appeal in this case and its tendency to disrupt a pending TCPA interlocutory appeal. *Cf., Jones,*

18

*Id.* Common law remedies are available to fill the gap similar in nature to those provided by the Statute of Westminster and the writ of elegit. *Cooke et al, v. Avery,* 147 US 375, 13 S.Ct. 340, 37 L. Ed. 209 (1893); *cf., Criswell v. Ginsberg & Foreman,* 843 S.W.2d 304, 306–07 (Tex.App.—Dallas 1992, no writ).[15] *Cooke* applies the doctrine of estoppel by deed, the Statutes of Westminster, and the extraordinary writ of elegit, all of which have founding era support as an integral part of the common law of England that was received by both the United States and the State of Texas. *Id.* (noting that liens arose from the power given by the Statute of Westminster)*; see also Carill & Dennis v. Kopuntze Brothers,* No. 35 86 Tex. 386 (1893) (writ of elegit was part of Texas common law). [16]

---

[15]    "The record disclosed nothing to justify the subjection of her separate estate to such a liability, and there was error in the judgment in this particular… This does not involve the disturbance of the verdict, or a reversal of the judgment in any other respect… The judgment will therefore … will be reversed as to her." *Id.*

[16]    In Chapter 61 of "A treatise of the laws of Texas relating to real estate," Vol. II, John Sayles and Henry Sayles, (St. Louis Great Book Company), entitled "Conveyance of land by sale under execution," the authors state that "the common law of England, not inconsistent with the constitution and laws of the State of Texas became the rule of decision in Texas on the 20th of March 1840. Early laws, art. 707; Civ. Statutes, art. 3128. In Art 1011, entitled "Sale of property under execution, at civil law," the authors further state that" Under the civil law in force Texas prior to the revolution, and in Art. 1012, entitled "Sale of Property under execution at common law," at p. 738, 739, they refer to the acts of 11 and 13 Edw. I as sources of writ of elegit, a "writ of execution upon a judgment recovered or acknowledged in a court of law, and in some cases a court of chancery." Id. Texas cases applying the Statute of Westminster and or the writ of elegit located by Appellant include *Collin County National Bank v. J.A. Hughes,* 220 S.W. 767 (Tex. 1920) *(citing Bullock v. Ballew,* 9 Tex. 499; *Anderson v. Boyd,* 64 Tex. 168-9 (supporting applicability of Statute of Westminster); *Jackson v. Railway,* 9 Tex. 304, 305 (1904) ("every right of action may be asserted upon its particular facts and circumstances, without regard to form … All our actions are in the strictest sense, special actions on the case, being what the actions framed under the statute of Westminster II have been described …); *Caldwell v. State,* Case No. 6722, 28 Texas Court of Appeals Reports 566, 577 (Tex. App. – Austin, 1889).

Consistent with federal common law, Appellant's live lis pendens notice is associated with a pending interlocutory appeal establishing that Bravenec acquired title subject to purchase money lien covenants that run with the land. See, Exhibit D and Rule 28(j) Letter #2; *cf.*, 2-12 *Powell on Real Property* § 17.04[3] (2013); *Restatement (Second) of Property, Land. & Ten.* §16.1 (1977). [17] Where a promisor transferee who agrees to satisfy an obligation that the promisee owes to a third party, the third party is the creditor beneficiary to the contract, the promisee is a surety for the promisor, and the beneficiary has a direct right of action against both. Restatement (Second) of Contracts § 302(1)(a).[18] Thus, Appellees' untimely case for affirmative relief based on *Martin v. Grehn* is fatally flawed in opposing in a collateral review of protected interests in lis pendens speech, for a property they no longer own, based on an ancillary probate court order entered in 2014.

---

[17]   *Cooke, Id.* ("In U. S. v. Scott, 3 Woods, 334, it was held by Mr. Justice Bradley, holding the circuit court for the western district of Texas, (June term, 1878,) that a judgment of that court was a lien on defendant's lands throughout the district, without being recorded in the several counties where they lay… "). While some Texas cases have held a party to be burdened must have actual or constructive notice for a covenant to "run with the land," *Baywood Estates Property Owners Ass'n, Inc. v. Caolo*, 392 S.W.3d 776, 782 (Tex. App.—Tyler 2012, no pet.), this Court has said those cases "confuse real covenants with equitable servitudes. Real covenants require privity of estate and run with the land regardless of notice. Equitable servitudes run against a successor in interest even where there is no privity of estate, if the successor has actual or constructive notice." *Id.* Based on the latter, Bravenec is a promisee who transferred under the pre-stay lis pendens notice filed in the State Trial Court Case No. 2014-CI-07644 and Interlocutory Appeal Case No. 04-14-00483-CV, the transferee is a promisor whose pendent lite purchase implicates restrictive covenants of record, and Appellant is a third party creditor and beneficiary of the lis pendens with a state court remedy that runs with the land. *Id.*

[18]   *Excel Willowbrook, LLC v. J.P. Morgan Chase Bank*, Case No. 12-20367 (5th Cir. April 24, 2014) (applying federal common law under Smith v. EMC Corp., 393 F.3d 590, 597 (5th Cir. 2004) ); see also, Restatement (First) of Contracts § 136 (1932) ("[A] promise to discharge the promisee's duty creates a duty of the promisor to the creditor beneficiary to perform the promise.").

WHEREFORE, PREMISES CONSIDERED, Appellant prays that the Court grant relief in all things, for such other relief both in law and in equity as he may be justly entitled.[19]

Dated: January 29, 2014

Respectfully Submitted,

*[signature]*

Rowland J. Martin
951 Lombrano
San Antonio, Tx 78207
(210) 323-3849

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2014, *"Appellant's Expedited Amended Motion To Strike"* was mailed to the Clerk of the Court, and to Ricardo Briones, Counsel for Appellees.

*[signature]*

Rowland J. Martin

---

[19] Contrary to the contentions of the Appellees' counter-appeal, the instant timely appeal is a proper vehicle for collateral review. *See, Pacific R. Co. of Mo. v. Missouri Pacific R. Co.,* 111 U. S. 505, 522 (1884) (noting that an "independent action"—which, like coram nobis, is an equitable means to obtain relief from a judgment—"may be regarded as ancillary to the prior suit"). Their attributions about vexatious litigation are stale. Judicial notice is requested that the Law Office of McKnight and Bravenec were attorneys of record for the Estate of King at an earlier stage of the state court tax suit litigation removed in Western District Case No. SA 09-CV-0949 which Appellees describe as vexatious. Their contentions lack credibility because the state court judgments that formed the basis of Case No. SA 09-CV-0949 were vacated by the state courts that rendered them. *See Rule 28(j) Letters #1 and #2.* The sole purpose of Appellees argument is to immunitize the Law Office of McKnight and Bravenec from "suit in a suit" legal malpractice liability for the underlying state court litigation. This issue is one of several issues under litigation in Fourth Court of Appeals Case No. 04-14-00483-CV.

# EXHIBITS

A.  Letter Of Deputy Clerk Nancy Dolly To Edward Bravenec and Ricardo Briones

B.  Appellees' Response To Appellant Motion To Recall And To Revise The Mandate

C.  Warranty Deed With Vendor's Lien

## *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE
NEW ORLEANS, LA 70130

August 14, 2014

Mr. Edward L. Bravenec
McKnight & Bravenec
405 S. Presa Street
3rd Floor
San Antonio, TX 78205

Mr. Ricardo Briones
McKnight & Bravenec
405 S. Presa Street
Suite 3rd Floor
San Antonio, TX 78205

    No. 14-50093   Rowland Martin, Jr. v. Charles Grehn, et al
                USDC No. 5:11-CV-414

Dear Mr. Bravenec, Mr. Briones,

Your 30 days to file the appellee's brief expired on August 4, 2014, see FED R. APP. P. 31(a)(1). If you wish to file a brief, we should receive it along with a motion to file the brief out of time within 10 days from this date. If we receive no response to this letter, we will submit the case to the court on the record and briefs already on file.

                      Sincerely,

                      LYLE W. CAYCE, Clerk

                      By: _____
                      Nancy F. Dolly, Deputy Clerk
                      504-310-7683

cc:
    Mr. Rowland J. Martin Jr.

CASE NO. 13-50070

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

ROWLAND J. MARTIN, JR.,
Successor in Interest to Morocco Ventures L.L.C.,
*Plaintiff-Appellant,*

v.

CHARLES GREHN; RELIANT FINANCIAL INCORPORATED; EDWARD
BRAVENEC, Esq.; THE LAW OFFICE OF MCKNIGHT AND
BRAVENEC; 1216 WEST AVENUE INCORPORATED,
*Defendants-Appellees.*

Appeal From The United States District Court
For The Western District of Texas, San Antonio Division

APPELLEES RESPONSE TO APPELLANT'S "MOTION TO RECALL
AND TO REVISE THE MANDATE"

The Law Office of McKnight & Bravenec
BY: /s/ Ricardo Briones
Texas Bar No.: 24062635
1800 W. Commerce St., Ste. 1
San Antonio, TX 78207
Phone: (210) 223-4080
Fax: (210) 223-2449

## Summary

1. This Court should deny Movant's request to revise its Mandate because (i) there exists no such relief; (ii) to the extent this Court interprets the Motion as a *stay* of the mandate, Movant shows no elements necessary for this relief; (iii) to the extent the Court interprets the Motion under 5th Cir. R. 41.2, Movant is *in pari delicto*, foreclosing him from equitable relief; and (iv), Movant's appeal was dismissed for failing to pay the docketing fee, not on merits – i.e., there is nothing to recall or revise.

## No Such Relief Exists

2. Movant asks this Court, "Pursuant to Appellate Rule 41.2 [sic]," to "Recall And To Revise The Mandate [sic]." *p. 2 of Movant's Motion.* There exists no such rule.

3. Neither the Court nor non-movant are obliged to liberally construe the motion. This notwithstanding, the Movant may be asking for the mandate to be *stayed* under Fed. R. App. P. 41(d) or *recalled* under 5th Cir. R. 41.2.

## This Court's Mandate May Not be Stayed

4. If the Court construes Movant's motion as arising under Fed. R. App. P. 41(d), he must show either (1) there is a motion for rehearing before this Court, or (2) a timely petition for writ of certiorari has been filed at the Supreme Court. The motion fails on both fronts. To-wit:

5. As to (1) there is no motion for rehearing pending before this Court. Indeed, Movant's last motion for rehearing was denied on November 6th, 2013; and

6. As to (2) Movant's petition for certiorari, that clock began running on November 6th, 2013. *See* 28 U.S.C. § 2101(c); Sup. Ct. R. 13.1, 13.3. Hence, Movant's window to file his writ tolled 90 days thereafter, on February 4th, 2014. Movant filed his petition for certiorari on March 11th, 2013; 38 days too late.

7. For the foregoing, Movant is not entitled to have the mandate stayed.

### Movant is Foreclosed from Equitable Relief

8. If the Court construes Movant's motion as arising under 5th Cir. R. 41.2, he must ask this Court to sit in equity so as to avoid injustice to Movant. Parties with dirty hands may not ask a court to sit in equity.

9. The records of this Court, the Western District of Texas', various Texas State District Courts', the Bexar County Probate Court's, and those of the Bexar County Deed Records show clearly and convincingly the breadth and scope of Movant's vexatious, frivolous, harassing, and abusive litigation, recordings, and filings.

10. On March 4, 2010, Honorable Chief District Judge Fred Biery, *sua sponte*, ENJOINED Movant from filing any more suits until he paid a $1,000 sanction for his frivolous filings (cause no. SA-09-CA-949-FB, Doc. 23). Despite the Court's

sanction and admonishment, Movant continues – to this day – to flood the Court and non-movant with meritless, harassing motions. That fine was never paid.

11. Further, on August 24, 2012, Hon. Leif M. Clark opinioned in his *sua sponte* Order quashing summons on Bexar County that, "[a]ll *repeated* attempts at removal have failed, because none can be considered – they are all outside the subject matter jurisdiction of the court. Such *continued attempts at removal* – and at obtaining stays or issuing summons related thereto – are *frivolous and serve no purpose* other than harassment and delay." (Bankruptcy cause no. 05-80116-C) (emphasis added).

12. On December 21, 2012, the Honorable Judge Harry Lee Hudspeth entered a judgment in favor of non-movant. In that order, the District Court compelled Movant to show cause as to why it should not find him in contempt. As the District Court noted in its Feb. 1st, 2013, order, Mr. Martin *wholly disregarded* the Court's demand, failed to show cause, and should be held in contempt. Having satisfied Fed. R. Civ. P. 11(c)(2), on December 27th, 2013, the District Court ordered Movant to pay non-movant $7,710. Non-movant has not been able to collect on that judgment and probably never will.

13. Movant has filed four lis pendens on non-movant's property. Each has been subsequently expunged by the appropriate court. Movant, in open court on March

19th, in Probate Court no. 1 of Bexar County, Texas, stated that he would continue to file lis pendens after a court expunges the last.

14. In sum, Movant's storied abuse of non-movant and the courts renders him *in pari delicto*, foreclosing him from equitable relief under 5th Cir. R. 41.2.

## There is nothing to Recall or Revise

15. This Court issued the District Court the mandate, dismissing Movant's *second* appeal from *the same* cause which had already been *affirmed in full* because Movant failed to pay the docketing fee.

16. Thus, there is no substance of the mandate to revise. Simply put, Movant's appeal was dismissed for the same reason he twice filed bankruptcy, has twice been dismissed from bankruptcy, been foreclosed on, sued by the local taxing authority at least four times, has an IRS tax lien, and has been sanctioned: Movant, true to form, failed to pay his bills.

WHEREFORE, premises considered, non-movant prays for the Court to deny Movant's motion and for any other relief it may be justly entitled.

Respectfully Submitted,

The Law Office of McKnight & Bravenec
BY: /s/ Ricardo Briones
Texas Bar No.: 240
1800 W. Commerce St., Ste. 1
San Antonio, TX 78207

Phone: (210) 223-4080
Fax: (210) 223-2449

## CERTIFICATE OF SERVICE

I certify that on March 20th, 2014, the foregoing responsive motion was served on the following persons via certified mail, return receipt requested at:

Rowland J. Martin, Jr.

951 Lombrano

San Antonio, TX 78207

*Pro Se Appellant*

Ms. Joyce A. Keating

1770 St. James Pl., Ste. 400

Houston, TX 77056

*Attorney for Co-Appellees*

/s/ Ricardo Briones
Ricardo Briones

STC GF# 1402942377

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

# WARRANTY DEED WITH VENDOR'S LIEN

STATE OF TEXAS        §
                  §   KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF BEXAR     §

THAT, EDWARD L. BRAVENEC, hereinafter called Grantor (whether one or more), for and in consideration of the sum of TEN AND NO/100 DOLLARS and other good and valuable considerations in hand paid by TORRALBA PROPERTIES, LLC, hereinafter called Grantee (whether one or more), whose mailing address is: _____ 18507 Canoe Brook _____ . San Antonio, TX 78258 _____ , the receipt of which is hereby acknowledged, and for the further consideration of the sum of $239,200.00, to Grantor in hand paid by PROSPERITY BANK, which amount is advanced at the special instance and request of the Grantee herein, and as evidence thereof, the Grantee has executed and delivered one certain promissory note of even date herewith for the sum of TWO HUNDRED THIRTY NINE THOUSAND TWO HUNDRED AND NO/100 DOLLARS ($239,200.00), payable to the order of PROSPERITY BANK, whose mailing address is as set forth in the hereinafter mentioned Deed of Trust, bearing interest and payable as in said note provided; said note containing the usual provisions for attorney's fees and acceleration of maturity in case of default, and being secured by Vendor's Lien herein and hereby expressly retained in favor of the Grantor, on the property hereinafter described, and as further security for the payment of said note, the SUPERIOR TITLE and VENDOR'S LIEN to said property are hereby transferred and conveyed to PROSPERITY BANK without recourse against Grantor, said note being also secured by Deed of Trust of even date herewith to DAVID ZALMAN, Trustee; has GRANTED, SOLD and CONVEYED and by these presents Grantor does hereby GRANT, SELL and CONVEY unto Grantee herein, the following described real property together with all improvements thereon situated in Bexar County, Texas, described as follows, to-wit:

> Lots 1, 2 and 3, Block 50, New City Block 8806, LOS ANGELES HEIGHTS ADDITION, City of San Antonio, Bexar County, Texas, according to plat thereof recorded in Volume 105, Pages 284-286, Deed and Plat Records of Bexar County, Texas, SAVE AND EXCEPT 0.00049 of an acre, being 21.51 square feet out of Lot 1, as described by Deed to the City of San Antonio recorded in Volume 5180, Page 1873, Real Property Records of Bexar County, Texas; and

> Lots 23, 24 and 25, Block 50, New City Block 8806, LOS ANGELES HEIGHTS SUBDIVISION, City of San Antonio, Bexar County, Texas, according to plat thereof recorded in Volume 8100, Page 97, Deed and Plat Records of Bexar County, Texas.

TO HAVE AND TO HOLD the above described premises, together with all and singular the rights and appurtenances thereunto in anywise belonging unto the said Grantee herein, Grantee's heirs, successors and/or assigns forever.  And Grantor does hereby bind Grantor, Grantor's heirs, successors and/or assigns, TO WARRANT and FOREVER DEFEND all and singular the said premises unto the Grantee herein, Grantee's heirs, successors and/or assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof.

Grantee assumes taxes for the current year on the property hereby conveyed.

This conveyance and the warranties of title given herein are made subject to any and all restrictions, easements, setback lines, covenants, conditions and reservations, of record affecting the property herein conveyed.

EXECUTED ON THE FOLLOWING DATE: _____ JUL 0 8 2014 _____.


_____
EDWARD L. BRAVENEC

(ACKNOWLEDGEMENT)

STATE OF TEXAS          §
COUNTY OF BEXAR         §

This instrument was ACKNOWLEDGED before me, on this the _8_ day of
_____, 20_14_, by EDWARD L. BRAVENEC.


_____
Notary Public, State of Texas


AFTER RECORDING RETURN TO:                    PREPARED IN THE OFFICE OF:
Torralba Properties, LLC                      WEST & WEST ATTORNEYS, P.C.
18507 Canoe Brook,                            2929 Mossrock, Suite 204
San Antonio, Texas 78258                      San Antonio, Texas 78230

# D


2014CI07644 -P00021

## Cause No. 2014-CI-07644

| | | |
|---|---|---|
| EDWARD L. BRAVENEC AND 1216 WEST AVE., INC. | ) ) | IN THE DISTRICT COURT |
| Plaintiff | ) ) | |
| v. | ) ) | 285TH JUDICIAL DISTRICT |
| ROWLAND MARTIN, JR. | ) ) | |
| Defendants | ) ) ) | BEXAR COUNTY TEXAS |
| ROWLAND MARTIN, JR. | ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | JURY TRIAL REQUESTED |
| EDWARD L. BRAVENEC, AND THE LAW OFFICE OF MCKNIGHT AND BRAVENEC | ) ) | |
| Defendants | ) | |

### PERFECTED NOTICE OF LIS PENDENS CONCERNING PURCHASE MONEY LIEN CLAIMS AND DEFECTIVE TITLE ISSUES AFFECTING THE PROPERTY KNOWN AS 1216 WEST AVE., IN SAN ANTONIO, TEXAS

Pursuant to Lis Pendens Statutes in Chapter 12 of the Texas Property Code, notice is hereby given in the above styled cause that Rowland Martin claims a purchase money lien interest attached to the subject property of Cause No. 2014-CI-07644 pending in the 285th district court of Texas. The subject property is commonly known as 1216 West Ave. in San Antonio Texas and is described as follows: "New City Block, Block 50, Lot 1, Except the North West 10.01 feet & Lots 2 & 3; commonly referred to as 1216 West Ave., Inc. San Antonio, Texas."

The subject property is encumbered by way of a purchase money lien and trespass to try title claim alleging public policy violations by Edward Bravenec and 1216 West Ave., Inc. Counterclaims are also asserted for legal malpractice and constructive trust rights. *Long Beach Mortg. Co. v. Evans*, 284 S.W.3d 406, 414 (Tex. App. Dallas 2009), reh'g overruled, (June 17, 2009) and review denied, (Nov. 20, 2009) and cert. denied, 130 S. Ct. 3470, 177 L. Ed. 2d 1056 (2010). Among other things, Martin seeks to enforce a purchase money interest in the nature of vendor's lien against the subject property, and to secure declarations that the title Bravenec is attempting to convey is void as a matter of public policy, and that Bravenec's capacity in relation to the asserted purchase money lien is that of a constructive trustee subject to a receivership. Subject to an accounting, Plaintiff reserves the right to ratify or decline to ratify the contract of sale that Bravenec alleges, and to collect the proceeds of the alleged pending sale. As such, the lis pendens is not a mere collateral attack to enforce an anticipated judgment.

1

The lien claim is based on Martin's capacity as a purchase money provider for the benefit of Moroco Ventures, LLC in 2003. *Long Beach*, Id. The factual basis for the purchase money lien claim is materially undisputed. The lien claim is specifically based on purchase money financing that Martin provided to Moroco Ventures, LLC to enable it buy the subject property on October 30, 2003. On October 30, 2003, Moroco Ventures, LLC purchased 1216 West Ave., Inc. from Roy Ramspeck et al for $285,000, by granting a first lien to Roy Ramspeck in the amount of $150,000, and by accepting third party purchase money funding from Rowland Martin in the amount of $135,000. The Escrow Account Statement shows that Sue Ulmstead of 1031 Corp. Inc. of Pottstown, Pennsylvania disbursed the third party purchase money from Commerce Bank Case Number 7200086872 on October 30, 2003. First American Title Receipt No. 18305465 shows that the closing agent, First American Title of San Antonio, Texas, received the purchase money funding by wire transfer on October 30, 2003, "for buyer," Moroco Ventures, LLC, and credited the account shown as other.

Litigation will reveal that the Bravenec parties' action to enjoin filing of lis pendens notices, and to cancel Martin's original purchase money notice, are not the least restrictive alternative available to accomplish plaintiffs' goal of adjudicating claims of tortious interference, and are arguably moot in light of the instant perfected lis pendens notice. *Cf., Long Beach, Id.* [1] Judicial notice of the underlying purchase money lien claims was previously taken in hearings before Bexar County Probate Court Case 2001-PC-1263 on March 19, 2014, and is confirmed by the probate court's narrowly tailored finding only that the Estate of King was not the holder of a lien interest or interest in title to the subject property. Judicial notice of purchase money lien claims was taken in the Bankruptcy Court's *Order on the Trustee's Motion To Dismiss* in Bankruptcy Case 06-50829 in 2007, and in the Bankruptcy Court's *Order on Martin's Motion For Reconsideration* in Bankruptcy Case 05-80116 dated August 10, 2012. The Bravenec parties' pleadings admit that the federal court declined to exercise jurisdiction to adjudicate the merits of purchase money lien claims and probate-related lis pendens challenges in *Martin v. Grehn*, Case No. SA 11-CV-0414 on Bravenec's "Motion For Contempt" dated February 13, 2014. Rule 8002 of the Federal Rules of Bankruptcy Procedure likewise precludes the Bravenec parties from relitigating the unappealled bankruptcy court orders that affirmatively support Martin's purchase money lien claim. See, *Final Judgment in Martin v. Grehn*, Case 13-50070 (5th Cir. September 25, 2013).

---

[1]     Analysis will reveal that Bravenec's pleadings are factually and procedurally unsupported due to their failure to identify Moroco Ventures, LLC as the legal owner of the subject property at the time the principals of the McKnight and Bravenec firm acquired their disputed second lien interests; due to their failure to acknowledge the legal and factual bases for Martin's purchase money security interest claims; and due to their reliance on an ex parte cancellation proceeding, without notice and pre-cancellation opportunities to be heard, and without specifying any process for relief from cancellation as required by Section 12.0008 of the Texas Property Code. *Cf., Bravenec v. Flores*, Case No. 04-11-004444-CV (Tex. App. – San Antonio, 2013) (affirming sanctions for unsupported foreclosure dispute against the appellant-party attorney).

2

Other counterclaims asserted by Martin rest on his capacity as an heir of the Estate of Johnnie Mae King and as a beneficiary of a fiduciary relationship in privity with Edward Bravenec, Albert McKnight and the Law Office of McKnight and Bravenec from 2003 to 2005. As set forth in the pleadings of record, Bravenec caused deficiencies in his firm's probate court representation of Martin and the Estate of King by allowing his firm to participate in an ultra vires debt assignment to acquire second lien interests for the purpose of exercising foreclosure rights, by withdrawing without a formal order to discharge his from the attorney client relationship, and by later seizing the subject property of their second lien interest in an unnoticed post-petition state court foreclosure proceeding while the property was an asset of the bankruptcy estate in Bankruptcy Case 06-50829. By virtue of these acts, it is alleged that Bravenec incurred equitably tolled legal malpractice liability due his reckless failure to adhere to the standard of care that a reasonable legal service provider would exercise under similar circumstances.

Lastly, it appears the Bravenec parties fail to state a claim for tortious interference upon which relief can be granted by alleging an executory contract with a supposed pendent lite purchaser. Public policy deprives Bravenec capacity to contract by way of a power of sale both due to his status as a former attorney of record of Martin, and as the assignee of an ultra vires debt assignment, at the time the alleged contract of sale with the pendent lite purchaser arose. *Zuniga v. Grose, Locke, & Hebdon,* 878 S.W. 2d 313, 318 (Tex. App. San Antonio 1994, writ ref'd) (invalidating assignment of legal malpractice claims on public policy grounds). There can be no interference proximately caused by a notice of lis pendens because such a notice does not legally prevent disposition of a property nor does it void a conveyance during the pendency of the lawsuit, but rather the interest of the grantor merely passes subject to the determination of the cause. *Cherokee Water Co. v. Advance Oil & Gas Co.,* 843 S.W.2d 132, 135 (Tex. App. Texarkana 1992), writ denied, (Mar. 31, 1993). Lastly, there is no injury to any justiciable interest of the Bravenec attorneys due to alleged unjust enrichment by them, and the offsetting injury their legal malpractice caused to Martin's liberty and property interests during the attorney client relationship with Bravenec and his firm. *Burrow v. Arce,* 997 S.W. 2d 229 (Tex. 1999).

Based on his priority as a purchase money creditor of Moroco Ventures on October 30, 2003 with an interest in the nature of a vendor's lien, Martin is requesting the 285th district court to enforce purchase money and public policy rights that encumber the subject property, and to treat the alleged pending contract of sale as void and subject to optional reinstatement by Martin.

Dated: June 2, 2014

Respectfully Submitted,

Rowland J. Martin
951 Lombrano
San Antonio, Tx 78207
(210) 323-3849



**1031 Corp.**

Full Service Intermediary

# 1031 CORP. ESCROW ACCOUNT STATEMENT

Name: Rowland J. Martin, Jr.

Case Number: 7200086872, Commerce Bank

Taxpayer ID #:

| Date | Type of Transaction | Amount | Balance |
| --- | --- | --- | --- |
| 6-25-03 | Initial Deposit | $182,238.77 | $182,238.77 |
| 4-28-03 | Withdrawal | $ 2,000.00 | $180,238.77 |
| 8-21-03 | Withdrawal | $ 450.00 | $179,788.77 |
| 10-30-03 | Withdrawal | $135,000.00 | $ 44,788.77 |
| 11-12-03 | Interest | $ 1,155.04 | $ 45,943.81 |
| 11-12-03 | Withdrawal | $ 45,943.81 | $ 0.00 |

## EXPLANATION OF ACCOUNT ACTIVITY

| Date | Transaction | Amount | Explanation |
| --- | --- | --- | --- |
| 6-25-03 | Deposit | $182,238.77 | Initial Deposit |
| 7-28-03 | Withdrawal | $ 2,000.00 | Earnest money deposit on 1216 West Ave., San Antonio, TX |
| 8-21-03 | Withdrawal | $ 450.00 | Fee for Home Inspection paid to Longhorn Home Inspections |

1200 East High Street, Suite 217, Pottstown, Pennsylvania 19464
(610) 970-1300    1-800-828-1031    FAX# (610) 970-2258
http://www.1031corp.com    e-mail: 1031help@1031corp.com

| 10-30-03 | Withdrawal | $135,000.00 | for inspection of 1216 West Avenue, San Antonio, TX 78201 Wire transfer to First American Title Insurance Company for acquisition of 1216 West Avenue, San Antonio, TX |
| 11-12-03 | Withdrawal | $ 45,943.81 | Wire transfer to Rowland Martin, balance of exchange funds |

1200 East High Street, Suite 217, Pottstown, Pennsylvania 19464
(610) 970-1300    1-800-828-1031    FAX# (610) 970-2258
http://www.1031corp.com    e-mail: 1031help@1031corp.com

**From:** Sue Umstead <sue@1031corp.com>
**To:** moroco676 <moroco676@aol.com>
**Subject:** Rowland Martin
**Date:** Thu, May 29, 2014 2:48 pm
**Attachments:** Statement.doc (108K)

Rowland,

Attached is the Escrow Account Statement we discussed.

I will be in touch with any additional information I can find.

Sue



**SUSAN UMSTEAD, CES®**

Senior Vice President  |  Certified Exchange Specialist®

1031 CORP.

100 Springhouse Drive, Suite 203, Collegeville, PA  19426

Toll-Free:  1.800.828.1031  |  Office:  610.792.4880 ext. 208

Mobile:  610.755.8520  |  Fax:  610.489.4366

Email:  sue@1031CORP.com  |  www.1031CORP.com

**Sign up for our Monthly Newsletter**

  

**ADVISORY:** 1031 CORP. serves as a Qualified Intermediary and cannot provide tax and/or legal advice.  Please discuss your particular situation with your tax and/or legal advisor.



**First American Title Company**
1846 N Loop 1604 W, Suite 101 San Antonio, TX 78248

PR: SOCENT  Ofc: 1830            DATE:           10/30/2003

                                 RECEIPT NO.:    18305465

## RECEIPT FOR DEPOSIT         FILE NO.:        TX03246428-SA30

FUNDS IN THE AMOUNT OF: $135,000.00

WERE RECEIVED FROM: 1031 Corp- for buyer-WI

CREDITED TO THE ACCOUNT OF: Other

TYPE OF DEPOSIT: Wire                REPRESENTING:   Closing Costs-wi

Comments:

Property Location: 1216 West Ave, San Antonio, TX 78213

BY: Gail Harris, 10/30/2003
ESCROW OFFICER: Karin Brown

"The validity of this receipt, for the deposit referenced,
is subject to clearance by the depository financial institution and credit to our account."

Other Copy

To: Janysek, Kristi
Subject: File Number-246428-Address-1216 West Ave (Email Ref=920037075)

File No.: TX03 246428 SA30

Buyer: Moroco Ventures, LLC

Seller: Roy M. Ramspeck

Property Address: 1216 West Ave, San Antonio, TX 78213

You can download Acrobat Reader at http://www.adobe.com/products/acrobat/readstep2.html

Kristi Janysek
Escrow Officer
First American Title Company
Phone: 210-390-3597 Ext.
Fax: 866-739-2652 Ext.

This message contains confidential information intended only for the use of the intended recipient(s) and may contain information that is privileged. If you are not the intended recipient, or the person responsible for delivering it to the intended recipient, you are hereby notified that reading, disseminating, distributing or copying this message is strictly prohibited.

If you have received this message by mistake, please immediately notify us by replying to the message and delete the original message immediately thereafter.

************************************************************************************************

This message may contain confidential or proprietary information intended only for the use of the addressee(s) named above or may contain information that is legally privileged. If you are not the intended addressee, or the person responsible for delivering it to the intended addressee, you are hereby notified that reading, disseminating, distributing or copying this message is strictly prohibited. If you have received this message by mistake, please immediately notify us by replying to the message and delete the original message and any copies immediately thereafter.

If you received this email as a commercial message and would like to opt out of future commercial messages, please let us know and we will remove you from our distribution list.

Thank you.~
************************************************************************************************
FAFLD

C-2

The clerk shall file this order in the main bankruptcy case as well as in this adversary proceeding.

SO ORDERED.

SIGNED this 10th day of August, 2012.

LEIF M. CLARK
UNITED STATES BANKRUPTCY JUDGE

IN THE U.S. BANKRUPTCY COURT
FOR THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| Rowland J. Martin<br>Plaintiff )<br>)<br>)<br>v. )<br>)<br>)<br>Edward Bravenec )<br>Defendant )<br>)<br>In Re ROWLAND J. MARTIN, JR., )<br>DEBTOR ) | Adversary Case 11-05141-LMC<br><br><br><br><br><br><br><br>Case No. 05-80116-LMC |

**AMENDED ORDER REOPENING BANKRUPTCY CASE NO. 05-80116-LMC**

The Court, having considered *"Debtor's Motion For Relief From The Bankruptcy Court's Order Of July 28, 2011 And To Compel Turnover Of Assets,"* finds that the post-petition foreclosure of involving the property at 1216 West Ave., in San Antonio, Texas, an asset of the Chapter 11 estate in Bankruptcy Case 06-50829 on October 3, 2006, is subject to this Court's *in custodio legis* authority

under <u>Bustamonte v. Cueva</u>, 2004, 371 F.3d 232, rehearing denied U.S. App. LEXIS 11719 (5th Cir. Tex., June 14, 2004) *cited in* <u>Ashley Place, Inc. v. Nicholson</u>, 2007 U.S. Dist. LEXIS 24801 (W.D. Tex. 2007) (Civil Action No. SA-06-CV-999-XR), and that the Debtor has demonstrated standing as a purchase money creditor of former Debtor in Possession Moroco Ventures, LLC. Therefore, the Court finds that the Debtor's motion for further proceeding in the above Adversary Case 11-05141-LMC should be GRANTED in part, and designated for hearing in part, pursuant to Bankruptcy Code Sections 105, 362, and 542. IT IS THEREFORE,

ORDERED, *"Debtor's Motion For Relief From The Bankruptcy Court's Order Of July 28, 2011 And To Compel Turnover Of Assets,"* is hereby granted in part to authorize *nunc pro tunc* relief from the Court's Order of July 28, 2011 in Bankruptcy Case No. 05-80116-LMC, and

IT IS FURTHER ORDERED, that the Debtor is authorized to prosecute turnover relief in the above Adversary Case Adversary Case 11-05141-LMC, based on his standing as a purchase money creditor of former Debtor in Possession Moroco Ventures, LLC, and that Edward Bravenec, 1216 West Ave., Inc., Bailey Street Properties, Inc., the Law Office of McKnight and Bravenec, and the Law Firm of Hughes Watters Askanase are designated as Respondents and Defendants in this matter.

### ###

028573      7270502860101 1

SO ORDERED.

SIGNED this 24th day of September, 2012.



LEIF M. CLARK
UNITED STATES BANKRUPTCY JUDGE

# United States Bankruptcy Court
### Western District of Texas
### San Antonio Division

| | |
|---|---|
| In re · | Bankr. Case No. |
| Rowland J. Martin | 05-80116-C |
| *Debtor* | Chapter 13 |
| Roland J. Martin | |
| *Plaintiff* | |
| v. | |
| Bexar County & Edward Bravenec | Adv. No. 11-5141 |
| *Defendants* | |
| Rowland J. Martin | |
| *Plaintiff* | |
| v. | Adv. No. 12-_____ |
| Albert McKnight & Edward Bravenec | |
| *Defendants* | |

Order Title

011377                          76904011588010

Came on for consideration the foregoing matter. Plaintiff Rowland Martin seeks reconsideration of this court's order abstaining from consideration of the lawsuit the subject of his removal, *Martin v. Bexar County et al.*, pending in state court. Along the way, it appears that, by amendment, he also seeks to remove another piece of state court litigation, *Martin v. McKnight et al.* He argues that the orders entered in that case might well be void *ab initio* under recent Texas Supreme Court authority.

The court declines to reconsider its earlier ruling regarding abstention. The court further remands *Martin v. McKnight*, to the extent that this pleading might be considered to be a removal of that action. The reasons are simple. There is no reason why these matters cannot be argued to the state court. Indeed, they are better being argued to the state court, as federal jurisprudence in this circuit differs from state court jurisprudence. The state court rule of law on this issue is more favorable to the plaintiff. He is better off in state court.

With regard to *Martin v. McKnight*, the court must remand that action, as the matter cannot be heard by this court. It does not fall within this court's subject matter jurisdiction. *See* 28 U.S.C. § 1334(b), 1452(b). The state court, by contrast, has plenary jurisdiction to decide the matters. The state court is permitted to construe and to apply federal law in a state court proceeding, just as federal courts are permitted to construe and to apply state law in federal proceedings.

The motion to reconsider is denied. The abstention order with regard to *Martin v. Bexar County* stands. The suit styled *Martin v. McKnight* is remanded to state court (to the extent it was ever removed).

01157    76904011588010



**Rowland J. Martin**
**951 Lombrano**
**San Antonio, Tx. 78207**
**(210) 323-3849**

January 29, 2014

Mr. Lyle W. Cayce
Clerk of the Court
U.S. Court of Appeals
600 Maestro Place
New Orleans, LA

Re:   *Martin v. Bravenec*, et al, Case No. 14-50093

Dear Mr. Cayce:

      Pursuant to Rule 28(j) and 28 U.S.C. 1653, this letter submits copies of the following unpublished cases cited in "Appellant's Expedited Amended Motion To Strike."

A.    *James, et al, v. Calkins*, Case No. 01-13-0018-CV (Tex. App. – Houston [1st Dist.] August 21, 2014).

B.    *Jones v. Beckman*, 2007 Cal. App. LEXIS 8326 (Cal. App., 2007).

C.    *Kinny v. Barnes*, Case No. 13-0043 (Tex., 2014).

D.    *Rose v. Rothrock*, Case No. 08-3884 (E.D. Penn, 2009).

E.    *Wallace v. Kelley*, 2007 U.S. Dist. LEXIS 56472 (D. Neb., Aug. 1, 2007).

Respectfully Submitted,

Rowland J. Martin

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2014, "Appellant's Expedited Amended Motion To Strike" was mailed to the Clerk of the Court, for service to Ricardo Briones, Counsel for Appellees, via ECF.

Opinion issued August 21, 2014



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00118-CV

———————————

**CAROLYN CALKINS JAMES, G. WESLEY URQUHART, G. WESLEY URQUHART, P.C., AND MARY ELIZABETH URQUHART, Appellants**

**v.**

**RICHARD STEPHEN CALKINS, AS AGENT- IN-FACT FOR MARY OLIVE CALKINS, AND MICHAEL EASTON, Appellees**

---

**On Appeal from the 125th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2011-21236**

---

## O P I N I O N

Appellant Carolyn Calkins James and her brother, appellee Richard Stephen

Calkins, have, for years, been embroiled in litigation in multiple courts regarding

the estate and guardianship of their mother. Mary Olive Calkins.[1] In the underlying suit, Richard, as agent-in-fact of Mary, and appellee Michael Easton, pro se,[2] sued Carolyn and her lawyers, claiming that they were fraudulently representing that Carolyn was the next friend of Mary and had fraudulently filed a lis pendens clouding title to Mary's home. The appellants filed a motion to dismiss pursuant to the Texas Citizen's Participation Act (TCPA), asserting that the lawsuit was related to their exercise of free speech, their freedom to petition, and their freedom of association. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011 (West Supp. 2013). The motion was overruled by operation of law.[3] *See id.*

---

[1] *See James v. Underwood*, No. 01-13-00277-CV, 2014 WL 1848738, at *1 (Tex. App. - Houston [1st Dist.] May 8, 2014, no pet. h) ("Carolyn James and her brother Richard Steven Calkins are in a legal dispute over who has the right to manage the assets of their mother, Mary Calkins. Their controversy has spawned multiple lawsuits filed in various district and probate courts in at least two counties resulting in no less than 11 issued appellate decisions—thus far—from the First and Fourteenth Courts of Appeals.").

[2] Easton is unrelated to Carolyn, Richard, or Mary, but purports to be the assignee of Richard's individual claims. Easton also has intervened in other disputes between the siblings and others on this basis. *See, e.g., James*, 2014 WL 1848738, at *1 & n.2 ("Michael Easton, an individual who is not related to James or Calkins, has repeatedly intervened, sued and been sued in the dispute between the siblings."); *Whatley v. Walker*, 302 S.W.3d 314 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (Easton intervened pro se in guardianship proceeding, claiming to be assignee of certain claims from ward's wife).

[3] Because the motion was overruled by operation of law in January 2013, we apply the then-effective version of the TCPA, which is the original version of the statute enacted in 2011. *See* Act of June 17, 2011, 82nd Leg., R.S., ch. 341, § 4, 2011 Tex. Gen. Laws 961, 964 (original enactment of TCPA effective June 17, 2011);

2

§ 27.008(a). We reverse and remand for further proceedings consistent with this opinion.

## Background

### *The guardianship proceeding*

In March 2008, Carolyn filed an application for guardianship of Mary in Harris County probate court. She contended that Mary was incapacitated and that Richard was abusing the power of attorney that Mary had executed in his favor in May 2007. That suit remains pending.

### *The 61st District Court declaratory judgment action*

In December 2008, while the guardianship action was pending, Carolyn, individually and as next friend of Mary, sued Richard in the 61st District Court of Harris County. She sought a declaratory judgment that Richard obtained Mary's 2007 power of attorney by fraud and breached his fiduciary duties in the handling of Mary's property; that Mary's execution of a 2007 deed conveying her home to a trust created and controlled by Richard is invalid; and that Richard is not the agent-in-fact of Mary. Richard, as the agent-in-fact of Mary, and Easton, as assignee of Richard's individual claims, counterclaimed to enforce the power of attorney.

---

Act of June 14, 2013, 83d Leg., R.S., ch. 1042, § 6, 2013 Tex. Sess. Law Serv. 2499, 2500 (West) (revisions to TCPA effective June 14, 2013).

In September 2010, Carolyn executed a notice of lis pendens stating that the 61st District Court case "involve[d] the establishment of an interest in . . . and/or the right to possession of" Mary's home and filed it with the Harris County clerk. That suit remains pending.

*The underlying lawsuit*

This appeal arises from a third lawsuit, which began in April 2011 and was filed in the 125th District Court. Easton and Richard, individually and as agent-in-fact for Mary, sued Judge Steve M. King of Probate Court #1 in Tarrant County, Probate Court #1 Court Administrator Mark W. Sullivan, Carolyn, and two of her lawyers, G. Wesley Urquhart and Kenneth Zimmern, alleging that Carolyn and her lawyers had conspired to engage in ex parte communications about Mary's guardianship proceeding with "nearly every single probate judge in this state."

In August 2011, Richard and Easton filed a second amended petition, wherein they dropped Judge King and Sullivan as defendants, and added as a defendant Mary Elizabeth Urquhart, who had notarized the 2010 lis pendens. The petition omitted the original allegations about an alleged conspiracy to communicate ex parte. Instead, the gravamen of this new petition was that Carolyn and her lawyers had fraudulently appeared in various courts on behalf of Mary, despite knowing that they had no authority to represent Mary, and had fraudulently

4

filed the lis pendens that gave notice of the 61st District Court suit in order to secure payment of Carolyn's legal fees, knowing that the filing was fraudulent and that Carolyn had no interest in Mary's home. The purpose of the suit was to cancel the lis pendens and stop appellants from suing on Mary's behalf. In their fourth amended petition, Richard sued only as agent-in-fact for Mary, and Easton sued individually and as assignee of Richard's individual claims. They also added G. Wesley Urquhart, P.C. as an additional defendant. Richard and Easton later amended the petition to include claims for actual and constructive fraud, barratry, and fraudulent lien.

On November 21, 2012, Carolyn, G. Wesley, and Mary Elizabeth filed a motion for leave to file a motion to dismiss under the TCPA, and filed a motion to dismiss under the TCPA along with G. Wesley Urquhart, P.C. The motion asserted that all of Richard and Easton's claims were based on the movants' actions in or related to various lawsuits, and therefore were an attempt to restrict the movants' freedom of speech, right to petition, and right of association. In response, Richard and Easton argued that the TCPA did not apply because their causes of action were all recognized causes of action in Texas.

On December 17, 2012, the trial court held a hearing, granted the motion for leave, and took the motion to dismiss under advisement. The trial court did not

rule on the motion within 30 days of the hearing, and it was therefore overruled by operation of law. The movants timely appealed.

## Appellate Jurisdiction

Before turning to the merits, we address (1) appellees' argument that we lack jurisdiction over this appeal because G. Wesley Urquhart, P.C. was not served, and instead voluntarily appeared, (2) appellees' motion to dismiss the appeals of Mary Elizabeth, G. Wesley, and his law firm because these appellants have been dismissed without prejudice from the underlying lawsuit, and (3) appellees' argument regarding whether the TCPA applies to this case.

## A. Are we deprived of jurisdiction over this appeal because one appellant waived service, and others sought leave to file a motion to dismiss after the statutory deadline?

Appellees argue that we lack jurisdiction over this appeal because G. Wesley Urquhart, P.C. was not formally served, and instead voluntarily appeared. The TCPA provides that "[a] motion to dismiss a legal action under this section must be filed not later than the 60th day after the date of service of the legal action." TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(b). Appellees argue, based on this language, that the TCPA does not permit a voluntarily-appearing defendant to move for dismissal, and that the other appellants' motion for leave to file their

6

motion to dismiss should have been denied because G. Wesley Urquhart, P.C. was never served.

### 1. Standard of Review and Applicable Law

We review questions of jurisdiction and of statutory construction de novo. *See Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). In interpreting statutes, our primary purpose is to give effect to the Legislature's intent by relying on the plain meaning of the text adopted by the Legislature, unless a different meaning is supplied by statutory definition or is apparent from the context, or the plain meaning leads to absurd results. *Tex. Lottery Comm'n*, 325 S.W.3d at 635.

### 2. Analysis

The TCPA provides that "[a] motion to dismiss a legal action under this section must be filed not later than the 60th day after the date of service of the legal action. The court may extend the time to file a motion under this section on a showing of good cause." TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(b). The parties agree that G. Wesley Urquhart, P.C. was never served, and instead voluntarily appeared on November 21, 2012, when it filed an original answer and joined in the motion to dismiss. Appellees argue that we must presume that each

7

word was included in the TCPA for a purpose, and therefore the use of the term "service" in section 27.003(b) must mean that the Legislature intended that only formally served defendants may move to dismiss under the TCPA. *See Eddins-Walcher Butane Co. v. Calvert*, 156 Tex. 587, 591 (Tex. 1957) ("Every word of a statute is presumed to have been used for a purpose, and a cardinal rule of statutory construction requires that each sentence, clause, phrase and word be give effect if reasonably possible.").

We disagree. With a few exceptions, a defendant may voluntarily appear in lieu of service. *See* TEX. R. CIV. P. 124 ("In no case shall judgment be rendered against any defendant unless upon service, or acceptance or waiver of process, or upon an appearance by the defendant."). Here, on its face, section 27.003(b) establishes a deadline by which a party should file a motion to dismiss under the TCPA. Appellees urge us to also construe section 27.003(b) as a limitation that prohibits voluntarily-appearing defendants from availing themselves of the protections of the TCPA. But interpreting the language in section 27.003(b) as merely prescribing a deadline for filing a motion to dismiss gives effect to all of the terms, and construing the statute in this manner does not lead to absurd results. *See Tex. Lottery Comm'n*, 325 S.W.3d at 635. Appellees cite no authority, and we have found none, to support the argument that the language in section 27.003(b)

8

was intended to limit application of the TCPA to defendants who are served with process. Indeed, appellees' contention that section 27.003(b) precludes a defendant who waives service from filing a motion to dismiss is incongruous with the legislative intent evident in the plain meaning of the statute. Accordingly, we conclude that the fact that G. Wesley Urquhart, P.C. appeared without having been served with process does not preclude it from filing a motion to dismiss under the TCPA.

Appellees also complain that the trial court granted Carolyn, G. Wesley, and Mary Elizabeth's motion for leave to file the joint motion to dismiss despite the fact that they had been served more than 60 days before they sought leave. They claim that this was error because it was premised upon the ability of G. Wesley Urquhart, P.C. to move for dismissal under the TCPA. But the statute expressly provides that the trial court may grant leave to file a motion after the 60-day deadline, and we have already concluded that G. Wesley Urquhart, P.C. was not precluded from filing a motion to dismiss. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(b). Accordingly, we conclude that the trial court did not err in granting the motion for leave. *See Tex. Lottery Comm'n*, 325 S.W.3d at 635 (our primary purpose is to give effect to the Legislature's intent by relying on the plain meaning of the text adopted by the Legislature unless it leads to absurd results).

9

**B. Are the appeals of Mary Elizabeth, G. Wesley, and G. Wesley Urquhart, P.C. moot?**

Appellees moved to dismiss the appeals of Mary Elizabeth, G. Wesley, and G. Wesley Urquhart, P.C., for lack of jurisdiction, arguing that their appeals are moot because they have been dismissed without prejudice from the underlying lawsuit while the appeal has been pending in this Court.

**1. Standard of Review and Applicable Law**

Whether we have subject-matter jurisdiction is a legal question that we review de novo. *Meeker v. Tarrant Cnty. Coll. Dist.*, 317 S.W.3d 754, 759 (Tex. App.—Fort Worth 2010, pet. denied); *see Trulock v. City of Duncanville*, 277 S.W.3d 920, 923 (Tex. App.—Dallas 2009, no pet.); *City of Shoreacres v. Tex. Comm'n of Envtl. Quality*, 166 S.W.3d 825, 830 (Tex. App.—Austin 2005, no pet.). The question of whether an appeal is moot implicates subject-matter jurisdiction. *See Meeker*, 317 S.W.3d at 759; *City of Shoreacres*, 166 S.W.3d at 830.

"The mootness doctrine prevents courts from rendering advisory opinions, which are outside the jurisdiction conferred by article II, section 1 of the Texas constitution." *Meeker*, 317 S.W.3d at 759 (citing *Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000)). "A controversy must exist between the parties at every stage of the legal proceeding, including the appeal." *Id.* (citing

10

*Bd. of Adjustment of City of San Antonio v. Wende*, 92 S.W.3d 424, 427 (Tex. 2002); *McClure v. JPMorgan Chase Bank*, 147 S.W.3d 648, 651 (Tex. App.—Fort Worth 2004, pet. denied)). "An issue may become moot when a party seeks a ruling on some matter that, when rendered, would not have any practical legal effect on a then-existing controversy." *Id.* When an appeal is moot, we must dismiss it. *See id.*

## 2. Analysis

After appellants filed this appeal, appellees nonsuited their claims against Mary Elizabeth, G. Wesley, and G. Wesley Urquhart, P.C., and the trial court signed orders granting the nonsuits. Appellees argue that, because these parties have been dismissed from the underlying proceeding, they have obtained the relief sought by their motion to dismiss, and their appeals are moot. The dismissed appellants, on the other hand, argue that the trial court should have granted their motion and awarded costs, fees, and sanctions, as they requested. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a) (if court dismisses case under TCPA, court "shall" award to moving party costs, attorney's fees, and other expenses as justice may require, and sanctions sufficient to deter the bringing of similar legal actions). Relying on *Villafani v. Trejo*, 251 S.W.3d 466 (Tex. 2008), appellants thus argue that their appeals are not moot.

11

We agree that Mary Elizabeth, G. Wesley, and G. Wesley Urquhart, P.C.'s appeals are not moot. In *Villafani*, Dr. Villafani moved to dismiss medical malpractice claims filed against him by Adela Trejo, arguing that Trejo's expert report did not meet the statutory requirements of the Medical Liability Insurance Improvement Act (MLIIA). *Id.* at 467. He also requested sanctions under the MLIIA. *Id.* The trial court denied the motion. *Id.* Later, Trejo filed a notice of nonsuit without prejudice as to Villafani, and the trial court dismissed her claims. *Id.* Villafani appealed the trial court's denial of his motion for sanctions and dismissal. *Id.* The court of appeals dismissed his appeal for lack of jurisdiction, holding that the nonsuit rendered Villafani's appeal moot. *Id.* at 467–68.

The Supreme Court reversed. Although typically parties have an absolute right to a nonsuit, the decision to nonsuit does not affect a non-moving party's independent claims for affirmative relief, which may include a motion for sanctions. *Id.* at 469–70. "Whether a particular sanction is considered a claim for affirmative relief that survives a nonsuit for later enforcement or appeal depends on the purpose of the sanction." *Id.* at 470. The Supreme Court reasoned:

> Allowing defendants to seek sanctions under the MLIIA for attorney's fees and dismissal with prejudice deters claimants from filing meritless suits. Removing a defendant's ability to appeal a denial of a motion for sanctions after a nonsuit frustrates this purpose; a claimant could simply nonsuit a meritless claim and later re-file the claim with impunity. Therefore, because the purpose of the sanctions under the

12

MLIIA survived Trejo's nonsuit of her claims, we hold that Villafani's motion was for sanctions that survive a nonsuit and could be the subject of an appeal.

*Id.* at 470–71 (citations omitted).

Likewise, here, the TCPA provides for dismissal and sanctions "sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter," and provides that such sanctions "shall" be awarded when dismissal is warranted under the TCPA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a). The reasoning of *Villafani* applies with equal force in this case. Accordingly, we hold that the nonsuits in the trial court did not render moot the appeals of Mary Elizabeth, G. Wesley, and G. Wesley Urquhart, P.C. *See Villifani,* 251 S.W.3d at 470–71.

## C. Does the TCPA apply to all of the claims in this case?

Appellees argue that the TCPA does not apply to this case because the underlying lawsuit was filed in April 2011, before the effective date of the TCPA.

### 1. Standard of Review and Applicable Law

The effective date of the TCPA is June 17, 2011. *See* Act of June 17, 2011, 82nd Leg., R.S., ch. 341, § 3, 2011 Tex. Gen. Laws 961, 964. The TCPA "applies only to a legal action filed on or after the effective date." *Id.*

13

The TCPA defines "legal action" as "a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(6). The Dallas Court of Appeals has noted that "[t]he definition of 'legal action' in the statute is broad and evidences a legislative intent to treat any claim by any party on an individual and separate basis." *Better Bus. Bureau of Metro. Dallas, Inc. v. Ward*, 401 S.W.3d 440, 443 (Tex. App.—Dallas 2013, pet. denied) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(6)). Thus, for example, if a lawsuit was filed before June 17, 2011, but a new plaintiff joined the lawsuit after June 17, 2011, that plaintiff's claims are subject to dismissal under the TCPA. *See id.*; *see also San Jacinto Title Servs. of Corpus Christi, LLC v. Kingsley Props., LP*, No. 13-12-00352-CV, 2013 WL 1786632, at *5–6 (Tex. App.—Corpus Christi Apr. 25, 2013, pet. denied) (rejecting defendants' argument that entire suit against them was subject to TCPA because one cause of action was added after June 17, 2011).

## 2. Analysis

### a. Defendants added after effective date

Here, it is undisputed that appellees filed their original petition before June 17, 2011, but amended it repeatedly after June 17, 2011. It is also undisputed that

14

appellees joined Mary Elizabeth Urquhart and G. Wesley Urquhart, P.C. as defendants after June 17, 2011. In *Better Business Bureau of Metropolitan Dallas, Inc. v. Ward*, 401 S.W.3d 440 (Tex. App.—Dallas 2013, pet. denied), the Dallas Court of Appeals concluded that, because the term "legal action" in the TCPA is "broad and evidences a legislative intent to treat any claim by any party on an individual and separate basis," the claims of a plaintiff who joined a lawsuit after the statute's effective date were subject to dismissal under the TCPA, even though the underlying lawsuit was filed before the statute's effective date. *Ward*, 401 S.W.3d at 443. We agree with *Ward's* rationale and, accordingly, we hold that the TCPA applies to all claims against Mary Elizabeth and G. Wesley Urquhart, P.C., because they were joined as defendants in the lawsuit after the statute's effective date. *See Ward*, 401 S.W.3d at 443 (party added after TCPA's effective date was subject to TCPA); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(6).

**b. Claims amended after effective date**

Appellees sued Carolyn and G. Wesley in April 2011, before the effective date of the TCPA. In the original petition, appellees asserted claims for monetary damages for an alleged civil conspiracy to violate the law through ex parte communications regarding the guardianship proceeding. The petition alleged that, as part of this conspiracy, Carolyn and her lawyers communicated ex parte with

15

Judge Steve M. King of Probate Court #1 in Tarrant County and Probate Court #1 Court Administrator Mark W. Sullivan in an attempt to get favorable rulings from Judge King. The appellees sought a temporary and permanent injunction to prevent further communications.

However, in their second amended petition, filed in August 2011, appellees abandoned the allegations and claims based on a conspiracy to communicate ex parte, and they also dropped Judge King and Sullivan as defendants. In the second amended petition, appellees asserted claims for fraud and slander of title. The factual basis for the claims was Carolyn and her lawyers' allegedly fraudulent attempt to (1) appear on behalf of Mary in court and (2) cloud title to Mary's home by filing the lis pendens. The seventh amended petition, filed in October 2012, was the live pleading at the time the motion to dismiss was filed, and its factual basis was similar to that of the second amended petition and included claims for actual and constructive fraud, statutory barratry under Texas Government Code section 82.0651, and fraudulent lien under Chapter 12 of the Property Code.[4]

The TCPA applies to a "legal action" filed on or after June 17, 2011, and a "legal action" includes "a lawsuit, *cause of action*, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or

---

[4] Appellees have amended their petition several times during the pendency of this appeal, but the causes of action remain the same.

16

equitable relief." *See* Act of June 17, 2011, 82nd Leg., R.S., ch. 341, § 3, 2011 Tex. Gen. Laws 961, 964; TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(6) (Emphasis supplied). As discussed above, in *Ward*, the Dallas Court of Appeals noted that the term "legal action" in the TCPA is "broad and evidences a legislative intent to treat any claim by any party on an individual and separate basis." *Ward*, 401 S.W.3d at 443. Here, appellees' claims of fraud, barratry, and fraudulent lien, which are premised on Carolyn's asserted right to represent Mary and Carolyn's filing of the lis pendens, were asserted for the first time after the effective date of the TCPA. Accordingly, we hold that they are subject to the TCPA.

We note that the Corpus Christi Court of Appeals concluded in *San Jacinto Title Services of Corpus Christi, LLC v. Kingsley Properties, LP*, No. 13-12-00352-CV, 2013 WL 1786632 (Tex. App.—Corpus Christi Apr. 25, 2013, pet. denied) that a cause of action that was added after the effective date of the TCPA was not subject to dismissal under the TCPA, but we find *Kingsley* distinguishable. *Id.* at *5–6. There, the original petition, filed before the effective date of the TCPA, alleged breach of fiduciary duty and tortious interference with prospective business relations. *Id.* at * 1. An amended petition filed after the effective date added a cause of action for business disparagement. *Id.* at *5. The defendants

17

argued that the addition of the business disparagement cause of action rendered all of the claims, including the claims that pre-dated the effective date of the statute, subject to the TCPA, but the court of appeals rejected that argument. *Id.* at *5–6. Notably, there is no indication that the claim added after the statute's effective date in *Kingsley* was based on different factual allegations than those in the original petition. Here, the amended petition filed after the statute's effective date included substantively different factual allegations, and all of the causes of action alleged in the amended petition were new causes of action. Accordingly, we conclude that the TCPA applies to all of appellees' claims against all appellants. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(6); *Ward*, 401 S.W.3d at 443.

Having concluded that we have jurisdiction and that the TCPA applies to all claims against appellants, we deny appellees' motion to dismiss and turn to the merits of the appeal.

## Motion to Dismiss under the TCPA

In their first issue, appellants contend that the trial court erred in denying their motion to dismiss because they proved by a preponderance of the evidence that the appellees' claims "are based on, relate to, or are in response to [appellants'] exercise of the right of free speech, right to petition, and/or right of association," and because appellees failed to establish by clear and specific

18

evidence a prima facie case for each essential element of their claims. Appellants also contend that they are entitled to damages, costs, and sanctions.

**A. Standard of Review and Applicable Law**

To obtain dismissal under the TCPA, a defendant must show "by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b). We review this determination de novo. *See Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, No. 01-12-00990-CV, 2013 WL 3716693, at *3 (Tex. App.—Houston [1st Dist.] July 16, 2013, pet. denied); *see also Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 725 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

If the movant meets its burden to show that a claim is covered by the TCPA, to avoid dismissal of that claim, a plaintiff must establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). "The Legislature's use of the term 'prima facie case' implies a minimal factual burden: 'prima facie' evidence is the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Better Bus. Bureau of Metro. Hous.*, 2013 WL

19

3716693, at *5 (quotation omitted). But "[c]onclusory statements are not probative and accordingly will not suffice to establish a prima facie case." *Id.* (citing *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223–24 (Tex. 2004)).

The TCPA requires that the proof offered address and support each "essential element" of every claim asserted with "clear and specific evidence." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). Accordingly, we examine the pleadings and the evidence in a light favorable to the nonmovant to determine whether it marshaled "clear and specific" evidence to support each element of its causes of action. *Better Bus. Bureau of Metro. Hous.*, 2013 WL 3716693, at *5.

"As the statute does not define 'clear and specific' evidence, these terms are given their ordinary meaning." *Id.* (citing *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)). "'Clear' means 'free from obscurity or ambiguity,' 'easily understood,' 'free from doubt,' or 'sure.'" *Id.* (quoting MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 229 (11th ed. 2003)). "'Specific' means 'constituting or falling into a specifiable category,' 'free from ambiguity,' or 'accurate.'" *Id.* (quoting MERRIAM WEBSTER'S COLLEGIATE DICTIONARY at 1198). "Clear and specific evidence has also been described as evidence that is 'unaided by presumptions, inferences, or intendments.'" *Id.* (quoting *Rehak Creative Servs.*, 404 S.W.3d at 726)).

20

## C. Analysis

Appellants argue that they proved that appellees' claims were exclusively based on, related to, and in response to appellants' exercise of their right of free speech, right to petition, and right to associate, because they demonstrated that all of appellees' claims are based on appellants' conduct in pending lawsuits. They assert that "all of Appellants' conduct in pending lawsuits is privileged, and protected as the exercise of the right to freely speak, freely associate, and to petition the government." Appellants' Br. 28. Accordingly, we consider whether appellants showed by a preponderance of the evidence that appellees' legal action is based on, relates to, or is in response their exercise of one of these rights, beginning with the right to petition. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b).

### 1. Exercise of the Right to Petition

The TCPA provides that "a communication in or pertaining to a judicial proceeding" constitutes the exercise of the right to petition. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)(A)(i). Appellants argue that the filing of a notice of lis pendens with the Harris County clerk, the filing of pleadings in the guardianship and the 61st District Court case, in which Carolyn purports to represent Mary's

21

interests, and the prosecution of those cases, are "by definition" a "communication in or pertaining to a judicial proceeding" that is within the scope of the TCPA.

We agree that appellees' claims in the underlying case are "based on, relate[] to, or [are] in response to" appellants' exercise of the right to petition as defined by the TCPA. *See id.* §§ 27.001(4)(A)(i), 27.005(b). As pleaded, appellees' actual and constructive fraud and barratry claims are "based on, relate[] to, or [are] in response to" Carolyn and her lawyers allegedly fraudulently claiming that they represent Mary in pleadings filed in various lawsuits. *See id.* § 27.005(b). Likewise, appellees' fraudulent lien claim is "based on, relates to, or is in response to" the lis pendens filed by Carolyn with the Harris County clerk that gave notice of her claims against Richard in the 61st District Court lawsuit, which seeks to cancel his transfer of Mary's home to a trust controlled by him. *See id.* All of these are "communication[s] in or pertaining to a judicial proceeding." *See id.* § 27.001(4)(A)(i). Appellees argue that that these actions cannot be constitutionally protected, but the cases they cite do not apply the TCPA, or do not involve communications of the type at issue here. Accordingly, we hold that appellants met their initial burden to prove that appellees' legal action related to their exercise of the right of petition. *See id.* § 27.005(c).

22

## 2. Appellees' Prima Facie case

Because appellants met their initial burden under the TCPA, the burden shifted to appellees to establish "by clear and specific evidence a prima facie case for each essential element" of their claims. *Id.* Accordingly, we examine the pleadings and the evidence in a light favorable to appellees to determine whether they marshaled "clear and specific" evidence to support each element of their causes of action. *See Better Bus. Bureau of Metro. Hous.*, 2013 WL 3716693, at *5. Appellees allege the following causes of action: actual and constructive fraud, statutory barratry under Texas Government Code section 82.0651, and fraudulent lien under Chapter 12 of the Property Code. Appellees' Br. 1. We address each of these in turn.

### a. Actual Fraud

"A plaintiff seeking to prevail on a fraud claim must prove that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by

23

actively and justifiably relying on that representation." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex. 2011).

Here, neither Richard, as agent-in-fact for Mary, nor Easton adduced any evidence that they relied upon any of the alleged fraudulent representations by the appellants. To the contrary, they assert that they knew from the beginning that the representations of appellants were false. Accordingly, we conclude that appellees failed to adduce clear and specific evidence to establish a prima facie case of actual fraud. *See Better Bus. Bureau of Metro. Hous.*, 2013 WL 3716693, at *5.

### b. Constructive fraud

"Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied) (citing *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964)). "An informal fiduciary duty may arise from a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship." *Id.* (citing *Assoc. Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998)). A familial relationship does not by itself establish a fiduciary relationship. *See Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980).

24

Here, appellees adduced no evidence to show that any fiduciary duty was breached. Accordingly, the evidence does not clearly and specifically establish all of the essential elements of a prima facie constructive fraud claim. *See Better Bus. Bureau of Metro. Hous.*, 2013 WL 3716693, at *5.

### c. Barratry

Section 82.0651 of the Government Code provides for civil liability for prohibited barratry. "A client may bring an action to void a contract for legal services that was procured as a result of conduct violating Section 38.12(a) or (b), Penal Code, or Rule 7.03 of the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas, regarding barratry by attorneys or other persons, and to recover any amount that may be awarded under Subsection (b)." *See* TEX. GOV'T CODE ANN. § 82.0651(a) (West Supp. 2013). Subsection (b) provides that a prevailing client may recover, among other things all fees and expenses paid under the contract, actual damages caused by the prohibited conduct, a penalty in the amount of $10,000; and reasonable and necessary attorney's fees. *See id.* § 82.0651(b).

As a threshold matter, section 82.0651 permits only the client of the "attorneys or other persons" to bring suit. The evidence shows that neither Richard, individually, nor Easton was a client of any of Carolyn's lawyers. Thus,

the evidence does not establish a prima facie case under section 82.0651 on their behalf.

Appellees allege in their petition that Carolyn and her lawyers entered into a fraudulent contingent fee contract which provided that Mary's assets would be used to pay for Carolyn's representation of Mary as next friend. They appear to claim that this contract constitutes a contract with Mary herself, therefore bringing it under the purview of section 82.0651. However, none of the evidence that appellees submitted showed the existence of any contract, or that the contract was actually entered into between Mary and Carolyn's lawyers, as opposed to Carolyn and her lawyers. Accordingly, viewing all of the evidence in the light most favorable to the appellees, we conclude that appellees failed to adduce clear and specific evidence to establish a prima facie case under section 82.0651. *See Better Bus. Bureau of Metro. Hous.*, 2013 WL 3716693, at *5.

### d. Fraudulent lien

Section 12.002 of the Property Code forbids the filing of a fraudulent lien and allows a party injured by a fraudulent lien to recover damages. It provides:

(a) A person may not make, present, or use a document or other record with:

(1) knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;

26

(2) intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States or another entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and

(3) intent to cause another person to suffer:

(A)   physical injury;

(B)   financial injury; or

(C)   mental anguish or emotional distress.

*See* TEX. CIV. PRAC. & REM. CODE ANN. § 12.002(a) (West Supp. 2013). The party asserting that a claimed lien is a fraudulent lien has the burden to prove the requisite elements in the statute. *Aland v. Martin*, 271 S.W.3d 424, 430 (Tex. App.—Dallas 2008, no pet.). A party who satisfies the section 12.002(a) requirements may recover $10,000 or the actual damages caused by the violation, whichever is greater, in addition to court costs, attorney's fees, and exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 12.002(b). A lis pendens may form the basis of a fraudulent lien claim. *See Brown v. Martin*, No. 13-10-00463-CV, 2011 WL 3366359, at *1 (Tex. App.—Corpus Christi Aug. 4, 2011, pet. denied) (mem. op.) (affirming judgment under section 12.002 for filing fraudulent lis pendens).

"Generally speaking, the purpose of lis pendens notice is twofold: (1) to protect the filing party's alleged rights to the property that is in dispute in the lawsuit and (2) to put those interested in the property on notice of the lawsuit." *David Powers Homes, Inc. v. M.L. Rendleman Co., Inc.*, 355 S.W.3d 327, 336 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Appellees claimed in their petition and in their response to the motion to dismiss that appellants knew that the lis pendens was fraudulent when it was filed, and that Carolyn admitted under oath that she knew that the lis pendens was fraudulent. But no evidence supports these assertions, and "[c]onclusory statements are not probative and accordingly will not suffice to establish a prima facie case." *Better Bus. Bureau of Metro. Hous.*, 2013 WL 3716693, at *5 (citing *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d at 223–24). The evidence shows that the lis pendens provided notice of the pendency of the 61st District Court lawsuit, which requested a declaratory judgment that a 2007 deed conveying Mary's home to a trust created and controlled by Richard is invalid. There is no evidence showing that Carolyn, or her lawyers, believe that the lis pendens is fraudulent or that the deed properly transferred the house to Richard. Appellees failed to adduce any evidence that, when viewed in the light most favorable to them, showed that any appellant knew that the lis pendens was fraudulent. Accordingly, we conclude that appellees failed to adduce clear and

28

specific evidence to establish a prima facie case that appellants violated section 12.002 of the Property Code. *See id.*

Because appellees did not meet their burden to establish "by clear and specific evidence a prima facie case for each essential element" of their claims, we sustain appellants' first issue in part with respect to their argument regarding their right to petition. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). Because we resolve this appeal on the right to petition ground, we do not reach appellants' arguments regarding the exercise of their right of free speech and right of association. And because we have determined that appellants' motion to dismiss should have been granted, we do not reach appellants' second issue, urging an alternative ground for dismissal of Easton's claims.

## Conclusion

We hold that appellants satisfied their burden under the TCPA to show that appellees' claims against them are based on, relate to, or are in response to, the exercise of their right to petition. *See id.* § 27.005(b). We further hold that appellees have failed to meet their burden to show, by clear and specific evidence, a prima facie case for each essential element of their claims. *See id.* § 27.005(c). We therefore reverse the trial court's denial of the motion to dismiss and remand the case to the trial court to award costs, fees, expenses, and sanctions as required

29

by the TCPA, and to order dismissal of the suit with prejudice. *See id.* § 27.009(a).

Rebeca Huddle
Justice

Panel consists of Justices Keyes, Sharp, and Huddle.

Justice Sharp, concurring without opinion.

**B**



**KATHLEEN MARY JONES, Plaintiff and Respondent, v. RICHARD E. BECKMAN et al., Defendants and Appellants.**

A114974

**COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT, DIVISION FOUR**

*2007 Cal. App. Unpub. LEXIS 8326*

**October 16, 2007, Filed**

**NOTICE:** NOT TO BE PUBLISHED IN OFFICIAL REPORTS. CALIFORNIA RULES OF COURT, RULE 8.1115(a), PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 8.1115(B). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 8.1115.

**PRIOR HISTORY:** [*1]
San Francisco County Super. Ct. No. CGC06-0451362.

**JUDGES:** Reardon, J.; Ruvolo, P.J., Sepulveda, J. concurred.

**OPINION BY:** Reardon

**OPINION**

Appellants, an attorney and his law firm, recorded a lis pendens after initiating a quiet title action against respondent. [1] Respondent in turn sued appellants and others on a slander of title theory and succeeded in defeating appellants' motion to strike under the anti-SLAPP statute, *Code of Civil Procedure section 425.16.* [2] The trial court correctly determined that appellants satisfied their burden under the first prong of the anti-SLAPP statute but, since the litigation privilege

affords immunity to the underlying activity of recording the lis pendens, it erred in concluding that respondent had shown a probability of prevailing on the merits of her claim. Accordingly, we reverse the order denying appellants' *section 425.16* motion to strike.

1    Appellants are Richard E. Beckman (Beckman) and the law firm Beckman Marquez LLP. Respondent is Kathleen Mary Jones.
2    SLAPP is the acronym for strategic lawsuits against public participation.

Unless otherwise specified, all statutory references are to the Code of Civil Procedure.

**I. FACTUAL BACKGROUND**

This case concerns real property commonly [*2] known as 595 Dalewood Drive in Orinda. In March 2005 a grant deed was filed in the Contra Costa County Recorder's Office in which Plusfive Holdings, L.P. (Plusfive), a limited partnership and grantor, granted the above property to "KMD Jones, a single woman." The deed was signed by "Sandra D. Marin, Managing Member, NorCal Interests, LLC [hereafter NorCal] General Partner" of Plusfive.

That June, Beckman filed a complaint to quiet title to the Orinda property on behalf of Plusfive. The complaint

was verified for Plusfive by "Sharrie Cutshall, General Partner." Shortly thereafter, Beckman filed a lis pendens referencing the pendency of the lawsuit alleging a real property claim affecting 595 Dalewood Drive, Orinda. A first amended complaint, again verified by Sharrie Cutshall, was filed in October. That complaint alleged an oral agreement pursuant to which Jones lent money to Plusfive and promised to assist with a mortgage refinance. In return, Plusfive provided Jones the deed "solely as security" for her obligations.

In November 2005 the Bledsoe Law Firm substituted in as counsel for Plusfive. The Bledsoe firm dismissed the quiet title action without prejudice in December 2005, but did [*3] not immediately withdraw the lis pendens. [3]

> 3 Apparently Jones moved to expunge the lis pendens but before the motion was heard, the Bledsoe firm recorded a notice of withdrawal and then filed a second lis pendens. Once a lis pendens has been expunged, section 405.36 requires leave of court before a second notice can be filed with respect to the affected property.

In April 2006 Jones pursued a slander of title action against Beckman, his law firm and others. As to appellants, the gist of Jones's first amended complaint was that the lis pendens lacked "any legal privilege or justification" and caused her pecuniary loss and lost opportunity to sell the property. Jones also asserted that the transaction by which she acquired nominal title to the property was illegal. Further, the personal verification in the quiet title action was unauthorized and without legal effect.

Appellants moved unsuccessfully to strike the complaint, asserting that Jones could not establish a probability of prevailing on her slander of title claim because, among other points, the litigation privilege afforded absolute immunity to the recording of the lis pendens. Opposing the motion, Jones argued that the underlying [*4] quiet title action was not properly verified or authorized, and consequently the lawsuit did not allege a real property claim and could not satisfy the requirements of the litigation privilege as detailed in *Civil Code section 47, subdivision (b)(4).* [4] Jones submitted a certificate of limited partnership for Plusfive listing NorCal as the sole general partner for the limited partnership; NorCal's articles of organization as a limited liability corporation (LLC), indicating that the LLC would be managed by one manager, but not identifying

the manager; and the grant deed executed by Sandra Marin as managing member of NorCal, for Plusfive.

> 4 This statute provides: "A recorded lis pendens is not a privileged publication unless it identifies an action previously filed with a court of competent jurisdiction which affects the title or right of possession of real property, as authorized or required by law."

Denying the motion, the trial court found that the filing of the lis pendens in connection with the quiet title action was constitutionally protected, but there was a probability Jones would prevail in her slander of title action based on evidence that appellants did not obtain a proper client [*5] verification. This appeal followed.

## II. DISCUSSION

### A. *Introduction*

Resolving the merits of a *section 425.16* motion entails a two-part analysis, concentrating initially on whether the challenged cause of action arises from protected activity within the meaning of the statute and, if so, proceeding next to whether the plaintiff can establish a probability of prevailing on the merits. (*Ampex Corp. v. Cargle (2005) 128 Cal.App.4th 1569, 1576.*) Our review of the trial court's ruling on an anti-SLAPP motion is de novo. [5] (*Carver v. Bonds (2005) 135 Cal.App.4th 328, 342.*)

> 5 The anti-SLAPP statute provides in part: "(b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. [P] (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." [*6] (*§ 425.16, subd. (b)(1), (2).*)

Although the filing of a notice of motion under the anti-SLAPP statute generally stays all discovery (*§ 425.16, subd. (g)*), a plaintiff opposing such a motion cannot rely on allegations in the complaint, but must

bring forth evidence that would be admissible at trial (*Ampex Corp. v. Cargle, supra,* 128 Cal.App.4th at p. 1576). However, the plaintiff's burden of establishing a probability of prevailing on the merits is not high: We do not weigh credibility or evaluate the weight of the evidence. Rather, we accept as true all evidence in the plaintiff's favor and assess the defendant's evidence only to determine if it defeats the plaintiff's proffer as a matter of law. (*Ibid.*)

### B. *Analysis*

#### 1. *Quiet Title*

Because the technicalities of the statutory provisions governing quiet title actions and lis pendens are at issue, we first review the pertinent legalities. An action to quiet title is commenced by filing a complaint, which must be verified. (§§ 761.010, subd. (a), 761.020.) Immediately upon the commencement of a quiet title action, the plaintiff must file a notice of pendency of the action in the appropriate county recorder's office(s). (§ 761.010, subd. (b).) [*7] The notice must contain the names of all parties to the action and a description of the affected property and, except for eminent domain actions, must be signed by the attorney of record or approved by a judge. (§§ 405.6, 405.20, 405.21.)

#### 2. *Threshold Matters*

At the outset we address Jones's assertion that appellants did not represent Plusfive in the quiet title action and lis pendens, and without a client, they had no standing to strike Jones's action as a SLAPP suit. [6] As a corollary matter, Jones argues that in any event standing is not conferred on an attorney under *section 425.16* unless he or she exercised a personal, independent constitutional right.

> 6    Lack of standing may be raised at any time during the proceedings. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361.)

Jones's first argument fails because nothing on the face of the quiet title complaint and companion lis pendens indicates that Sharrie Cutshall's verification was perjured or otherwise unauthorized, and nothing in the moving and opposing papers show that appellants had reason to mistrust Sharrie Cutshall. [7] Indeed, appellants' papers show that Plusfive was the client, [*8] that

Sharrie Cutshall verified the pleadings under penalty of perjury, declaring she was the general partner of Plusfive with authority to make the verification on behalf of Plusfive. Further, Beckman declared that he relied on the verified allegations of Cutshall in filing the lis pendens, a document he was obligated to file and sign in connection with the quiet title action. Although Jones's evidence raises a question about the correct identity of the individual with authority to verify a complaint on behalf of Plusfive, the evidence is inconclusive.

> 7    Jones contends that because the deed was signed by Sandra Marin, the managing member of NorCal, as general partner for Plusfive, and Beckman relied on the deed, as a reasonable attorney he should have asked "Who is Norcal?" By implication, Jones suggests he should have investigated Sharrie Cutshall's representations. This argument is based on speculation. Jones does not know how Cutshall demonstrated to Beckman her authority to act on behalf of Plusfive. Moreover, the deed itself does not establish that NorCal had only one manager (as indicated in NorCal's articles of organization), let alone only one member. An LLC can have one or more [*9] members (*Corp. Code, § 17050, subd. (b)*) and can be managed by one manager, by more than one manager, or by all its members (*id.,* §§ 17051, subd. (a)(5), 17151). A manager may, but need not be, a member. (*Id.,* § 17151, subd. (a).) A written operating agreement may provide for appointment of officers who in turn will have the powers and duties specified therein or in the articles of organization. An officer may, but need not be, a member or manager of the LLC. (*Id.,* § 17154, subd. (a).) Thus for all we know, Sharrie Cutshall was a member and an officer of NorCal, with authority to sign written instruments, although she was not NorCal's manager.

More to the point, when initially evaluating a client's case and assessing its tenability, an attorney may rely on information provided by the client unless the attorney is on notice of specific facts which, if true, would negate the client's version of events. (*Morrison v. Rudolph (2002) 103 Cal.App.4th 506, 512-513,* disapproved on other grounds in *Zamos v. Stroud (2004) 32 Cal.4th 958, 973.*) As explained by a commentator: "Usually, the client provides information upon which the attorney relies in determining whether probable cause exists for [*10]

initiating a proceeding. The rule is that the attorney may rely on those statements as a basis for exercising judgment and providing advice, unless the client's representations are known to be false." (1 Mallen & Smith, Legal Malpractice (2007 ed.) § 6.19, p. 744, fn. omitted.)

As to Jones's second argument that Beckman lacked standing because he was not exercising his own constitutional rights in filing the lis pendens, this is not a standing issue. Rather, it is an attack on the trial court's decision that Beckman had satisfied the requirements of the first prong of the anti-SLAPP statute. We reject this argument outright. Jones has not filed a cross-appeal and has not shown that review of this issue is necessary to decide whether any error asserted by appellants was prejudicial to them. Such a showing is required to bring her within the exception to the general rule that a respondent cannot obtain affirmative relief unless he or she files a cross-appeal. (§ 906; *Building Industry Assn. v. City of Oceanside* (1994) 27 Cal.App.4th 744, 758, fn. 9.)

In any event, the merits of the argument do not favor Jones. The gravaman of Jones's slander of title action against appellants is that Beckman [*11] recorded a lis pendens against her property without justification or legal privilege. Under the anti-SLAPP statute, the predicate "act" required by subdivision (b)(1) that enables a person to prosecute a motion to strike includes "any . . . writing made in connection with an issue under consideration or review by a . . . judicial body. . . ." (*§ 425.16, subd. (e)(2).*) A lis pendens is required or permitted by law " 'in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is invoked.' [Citation.]" (*Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948, 958.) Stated more broadly, "any act" of a person in furtherance of petition or free speech rights which triggers a lawsuit subject to an anti-SLAPP motion embraces "communicative conduct such as the filing, funding, and prosecution of a civil action" and "qualifying acts committed by attorneys in representing clients in litigation." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056). Beckman was required to sign the lis pendens and the recording of the lis pendens was a necessary part of commencing the quiet title [*12] action. (§§ 405.21, 761.010.) These were qualifying acts within the anti-SLAPP statute which satisfied his threshold burden in prosecuting the motion. Moreover, the protected statements or writings upon which the validity of a *section 425.16* motion depend need not be made on the defendant's own behalf. They can be made, for example, on behalf of an attorney's clients or the general public. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1116.)

We similarly reject Jones's assertion that Beckman cannot establish the first prong of *section 425.16* because the conduct giving rise to Jones's action was illegal, and thus not constitutionally protected. Again, Jones has not cross-appealed or made the showing required by *Building Industry Assn. v. City of Oceanside, supra,* 27 Cal.App.4th at page 758, footnote 9. And again, the merits are against Jones.

Relying primarily on *Flatley v. Mauro* (2006) 39 Cal.4th 299, Jones maintains that Sharrie Cutshall committed perjury in verifying the quiet title complaint, perjury is not constitutionally protected activity, and thus appellants cannot establish a constitutionally protected right as required by *section 425.16.* First, Cutshall's [*13] verifying statement that she was a general partner of Plusfive, while technically incorrect, does not, without further proof of willfulness and knowledge, constitute perjury as a matter of law. (See *Pen. Code, § 118.*) And, as appellants point out, her statement is capable of innocent meaning, namely a shortcut for "I am a member of the general partner of Plusfive." Further, Cutshall's declaration that she had authority to make the verification is not defeated by the fact that she was not *the* general partner of Plusfive.

Second, *Flatley* does not help Jones. In *Flatley,* defendant attorney's actions--a demand letter on behalf of a client who contended a well-known entertainer raped her, as well as subsequent telephone calls to the entertainer's attorneys--spurred a suit for civil extortion and other torts. Our Supreme Court concluded that these actions, which were not controverted, constituted criminal extortion as a matter of law. (*Flatley v. Mauro, supra,* 39 Cal.4th at pp. 328-329.) The court went on to explain that a defendant pursuing an anti-SLAPP motion need not establish that its actions are constitutionally protected as a matter of law. Rather, the defendant must preliminarily [*14] make a prima facie showing that the plaintiff's cause of action arose from acts of the defendant in furtherance of free speech or *petition* rights in connection with a public issue. (*Id. at pp. 314, 319.*) However, if the defendant concedes, or the evidence establishes conclusively, that the assertedly protected

petition or speech activities were illegal as a matter of law, the defendant cannot use the anti-SLAPP statute to strike the plaintiff's complaint. (*Id. at pp. 320, 333.*) *Flatley* does not apply to the instant matter for the simple reason that *appellants*--the defendants in Jones's slander of title action--did not engage in any illegal conduct, let alone conduct that was illegal as a matter of law.

Jones also suggests that Beckman misled the court in violation of *Business and Professions Code section 6068, subdivision (d)*, which charges an attorney with the duty to "employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by artifice or false statement of fact or law." Again, there is no evidence that Beckman deliberately misled the court. Further, as stated [*15] above, Beckman could rely on Cutshall's representations absent knowledge of facts to the contrary. And finally, Cutshall's lack of authority and perjury have not been established as a matter of law.

### 3. *No Probability of Prevailing on the Merits*

To recover on the tort of slander of title a plaintiff must show: (1) a false publication that is disparaging of another's property; (2) lack of privilege or justification in making the publication (thus exhibiting malice, express or implied); and (3) causation, i.e., direct and immediate pecuniary loss. (*Howard v. Schaniel (1980) 113 Cal.App.3d 256, 263-264.*) Here the trial court believed that Jones would probably be able to show that Cutshall was not authorized to verify the complaint. Without proper client verification, the court reasoned that the lis pendens was a publication "without privilege or justification" and thus malice could be implied as required by the tort of slander of title. By the same token, it reasoned that the litigation privilege was not absolute under *Civil Code section 47, subdivision (b)(4)*. (See fn. 4, *ante.*) The trial court's reasoning was flawed.

*Civil Code section 47, subdivision (b)(4)*, added by amendment in 1992 [*16] (Stats. 1992, ch. 615, § 1, pp. 2739-2740), altered slightly the absolute privilege afforded lis pendens under this statute. As this court has explained, now a lis pendens is "protected only when the party using this remedy has filed an action affecting title or possession to the property with a court of competent jurisdiction." (*Wilton v. Mountain Wood Homeowners Assn. (1993) 18 Cal.App.4th 565, 569, fn. 1.*) In other words, the litigation privilege applies if the lis pendens

was authorized by law, i.e., it (1) identifies an action on file in a court of competent jurisdiction that (2) affects title or right to possession of real property. Thus, with this amendment, a groundless lis pendens not tied to a lawsuit and not affecting real property could not cloud title by finding shelter under the litigation privilege.

For example, in *Palmer v. Zaklama (2003) 109 Cal.App.4th 1367, 1381*, the defendants filed lis pendens in underlying collection and bankruptcy actions. These actions would not support a lis pendens because they did not concern title to or possession of real property. Consequently, the privilege did not attach. Unfortunately, the *Palmer* court made an erroneous, more sweeping [*17] statement in dicta which Jones and, most likely, the court below, relied on: "[I]f the pleading filed by the claimant in the underlying action does not allege a real property claim, *or the alleged claim lacks evidentiary merit*, the lis pendens, in addition to being subject to expungement, is not privileged." (*Id. at p. 1380*, italics added.) Contrary to the implication of the above dicta, allegations in the complaint determine whether a real property claim is involved. Independent evidence is not required. Section 405.4 defines "real property claim" for purposes of the lis pendens statutes as "the *cause or causes of action in a pleading* which would, if meritorious, affect (a) title to, or the right to possession of, specific real property . . . ." (Italics added; see also *Urez Corp. v. Superior Court (1987) 190 Cal.App.3d 1141, 1149.*)

Here, Beckman satisfied the requirements of *Civil Code section 47, subdivision (b)(4)* and the privilege attached to the filing of the lis pendens. The notice referenced a duly filed lawsuit. The complaint alleged an action to quiet title and specifically described the real property at issue. The recording of the lis pendens was "authorized or required by [*18] law," specifically the lis pendens and quiet title statutes. (§§ 405.20, 761.010.) Immunity was conferred on Beckman, thus defeating an element of Jones' slander of title action.

Nonetheless, Jones insists she will probably prevail in her action, relying first on the above-quoted dicta from *Palmer*. Specifically, she asserts that "Beckman's filing of a suit against her when he had no actual client was thus an action without evidentiary merit" and was unprivileged under *Palmer*. [8] First, this language from *Palmer* is contrary to *Civil Code section 47, subdivision (b)(4)* because it adds a requirement not reflected in the

statute. We will not rewrite a statute to make express an intention that was not expressed in the language of the provision in question. (*Lazar v. Hertz Corp.* (1999) 69 *Cal.App.4th 1494, 1503.*) Second, although Jones raised an issue about Cutshall's authority to verify the complaint, she has not established that there was no client. The four corners of the complaint and lis pendens do not show that the action was without evidentiary merit. Nor did further investigation rule out her authority.

8   Jones also claims that the quiet title action lacked evidentiary merit because [*19] the transaction on which it was based was legally unenforceable. She claims the transaction was an "illegal" hidden mortgage. Again, we do not assess evidentiary merit. The nature of the underlying transaction has not been adjudicated. In any event, *Hainey v. Narigon (1966) 247 Cal.App.2d 528, 531-532,* upon which Jones relies, does not assist her. There, the reviewing court held that it was against public policy to use a veteran as a straw man to obtain favorable GI financing. Here the quiet title complaint alleged that Plusfive executed and delivered the grant deed to Jones, to be held solely as security for Plusfive's obligations to repay funds lent to Jones to refinance the property. These allegations are more in the nature of a deed absolute in form, in which it can be shown that the deed was intended as a mere security device for an obligation. (See *Wilcox v. Salomone (1953) 118 Cal.App.2d 704, 709-710.*)

Third, as recently reiterated in *Jacob B.,* the litigation privilege extends *even to perjury.* (*Jacob B. v. County of Shasta, supra,* 40 *Cal.4th at p. 958.*) And, more specifically, for purposes of the protection of the litigation privilege, "[a] notice of lis pendens, as a category, [*20] is permitted by law and, hence, is privileged, even if a specific notice, being perjurious, might be considered not permitted by law." (*Id. at p. 959.*) We question how the *evidentiary* merit of the quiet title action, or the related recordation of the lis pendens, could be relevant to the question of whether the litigation privilege applies. Even a publication or republication [9] of a pleading that is based on perjury, and hence by definition lacking in merit, is covered.

9   The recording of a notice of lis pendens "is in effect a republication of the pleadings." (*Albertson v. Raboff (1956) 46 Cal.2d 375, 379.*)

## III. DISPOSITION

The trial court's order denying appellant's motion to strike is reversed. Jones to bear costs on appeal.

Reardon, J.

We concur:

Ruvolo, P.J.

Sepulveda, J.

# IN THE SUPREME COURT OF TEXAS

No. 13-0043

ROBERT KINNEY, PETITIONER,

v.

ANDREW HARRISON BARNES (A/K/A A. HARRISON BARNES, A. H. BARNES, ANDREW H. BARNES, HARRISON BARNES), BCG ATTORNEY SEARCH, INC., EMPLOYMENT CROSSING, INC. AND JD JOURNAL, INC., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

**Argued January 9, 2014**

JUSTICE LEHRMANN delivered the opinion of the Court.

A hallmark of the right to free speech under both the U.S. and Texas Constitutions is the maxim that prior restraints are a heavily disfavored infringement of that right. So great is our reticence to condone prior restraints that we refuse to allow even unprotected speech to be banned if restraining such speech would also chill a substantial amount of protected speech. This danger is before the Court today, as we are asked whether a permanent injunction restraining future speech is a constitutionally permissible remedy for defamation following an adjudication on the merits. On the one hand, it is well settled that defamation is an abuse of the privilege to speak freely; our

holding today does not disturb that. On the other, it is also well settled that prior restraints are rarely permitted in Texas due to their capacity to chill protected speech.

The issue at hand is more specifically presented as whether a permanent injunction is an unconstitutional prior restraint where the injunction (1) requires the removal or deletion of speech that has been adjudicated defamatory, and (2) prohibits future speech that is the same or similar to the speech that has been adjudicated defamatory. We hold that, while the former does not enjoin future speech and thus is not a prior restraint, the latter constitutes a prior restraint that impermissibly risks chilling constitutionally protected speech. Because the court of appeals failed to recognize this distinction in affirming summary judgment for the defendant, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

## I. Background

BCG Attorney Search, Inc. employed Robert Kinney as a legal recruiter until 2004, when he left and started a competing firm. Several years later, BCG's President, Andrew Barnes, posted a statement on the websites JDJournal.com and Employmentcrossing.com implicating Kinney in a kickback scheme during his time with BCG. Describing allegations in a lawsuit Barnes had previously filed against Kinney in California, Barnes stated:

> The complaint also alleges that when Kinney was an employee of BCG Attorney Search in 2004, he devised an unethical kickback scheme, attempting to pay an associate under the table at Preston, Gates and Ellis (now K&L Gates) to hire one of his candidates. Barnes says that when he discovered this scheme, he and other BCG Attorney Search recruiters immediately fired Kinney. The complaint in the action even contains an email from Kinney where he talks about paying the bribe to an associate at Preston Gates in return for hiring a candidate.

2

The posted statements prompted Kinney to sue Barnes, BCG, and two other companies Barnes owned (Employment Crossing, Inc. and JD Journal, Inc.) for defamation in Travis County. Kinney did not seek damages in his petition, requesting only a permanent injunction following a trial on the merits.[1] Specifically, Kinney sought an order requiring Barnes to (a) remove the allegedly defamatory statements from Barnes's websites, (b) contact third-party republishers of the statements to have them remove the statements from their publications, and (c) conspicuously post a copy of the permanent injunction, a retraction of the statements, and a letter of apology on the home pages of Barnes's websites for six months. Kinney has since abandoned his demand for an apology and retraction.

Barnes filed a motion for summary judgment on the ground that the relief sought would constitute an impermissible prior restraint on speech under the Texas Constitution. The trial court granted the motion, and the court of appeals affirmed without addressing whether Barnes's statements were defamatory. We too will limit our review to the constitutionality of Kinney's requested relief and assume only for purposes of that analysis that the complained-of statements are defamatory.

## II. Discussion

"Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of

---

[1] According to Barnes, Kinney previously filed and nonsuited a defamation suit against the same defendants seeking monetary damages but no injunctive relief.

speech or of the press." TEX. CONST. art. I, § 8. Enshrined in Texas law since 1836,[2] this fundamental right recognizes the "transcendent importance of such freedom to the search for truth, the maintenance of democratic institutions, and the happiness of individual men." TEX. CONST. art. I, § 8 interp. commentary (West 2007). Commensurate with the respect Texas affords this right is its skepticism toward restraining speech. While abuse of the right to speak subjects a speaker to proper penalties, we have long held that "pre-speech sanctions" are presumptively unconstitutional. *Davenport v. Garcia*, 834 S.W.2d 4, 9 (Tex. 1992); *see also Ex parte Tucker*, 220 S.W. 75, 76 (Tex. 1920).

The First Amendment of the U.S. Constitution is similarly suspicious of prior restraints, which include judicial orders "forbidding certain communications" that are "issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation and internal quotation marks omitted). The U.S. Supreme Court has long recognized that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *see also id.* ("If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time." (quoting A. BICKEL, THE MORALITY OF CONSENT 61 (1975))). As such, they "bear[] a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). This cornerstone of First

---

[2] The provision as currently worded dates back to 1876, but a similar provision was part of the 1836 Texas Independence Constitution. *Davenport v. Garcia*, 834 S.W.2d 4, 7-8 (Tex. 1992).

4

Amendment protections has been reaffirmed time and again by the Supreme Court,[3] this Court,[4] Texas courts of appeals,[5] legal treatises,[6] and even popular culture.[7]

Nevertheless, freedom of speech is "not an absolute right, and the state may punish its abuse." *Near v. Minnesota*, 283 U.S. 697, 708 (1931) (citation and internal quotation marks omitted). To that end, the common law has long recognized a cause of action for damages to a person's reputation inflicted by the publication of false and defamatory statements. *Neely v. Wilson*, 418 S.W.3d 52, 60 (Tex. 2013) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 11 (1990)); *see also Ex parte Tucker*, 220 S.W. at 76 ("There can be no justification for the utterance of a slander. It cannot be too strongly condemned."). The U.S. Supreme Court and this Court have been firm in the conviction that a defamer cannot use her free-speech rights as an absolute shield from punishment.

---

[3] *See, e.g., Stuart*, 427 U.S. at 561 ("[I]t is . . . clear that the barriers to prior restraint remain high unless we are to abandon what the Court has said for nearly a quarter of our national existence and implied throughout all of it."); *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam).

[4] *Davenport*, 834 S.W.2d at 9; *Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex. 1983) (per curiam); *Ex parte Price*, 741 S.W.2d 366, 369 (Tex. 1987) (Gonzalez, J., concurring) ("Prior restraints . . . are subject to judicial scrutiny with a heavy presumption against their constitutional validity.").

[5] *Tex. Mut. Ins. Co. v. Sur. Bank, N.A.*, 156 S.W.3d 125, 128 (Tex. App.—Fort Worth 2005, no pet.) ("[P]rior restraints on speech are presumptively unconstitutional."); *San Antonio Express-News v. Roman*, 861 S.W.2d 265, 267 (Tex. App.—San Antonio 1993, orig. proceeding) (per curiam).

[6] *See* Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 SYRACUSE L. REV. 157, 173 (2007) ("[N]ever in the 216 year history of the First Amendment has the Supreme Court found it necessary to uphold a prior restraint in a defamation case . . . ."); A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 BUFF. L. REV. 655, 656 (2008).

[7] THE BIG LEBOWSKI (PolyGram Filmed Entertainment & Working Title Films 1998) ("For your information, the Supreme Court has roundly rejected prior restraint.").

This case asks us to examine these conflicting principles, and involves a two-part inquiry. First, we examine whether a permanent injunction against defamatory speech, following a trial on the merits, is a prior restraint. Kinney contends that such a "post-trial remedial injunction" is not properly characterized as a prior restraint at all, much less one that is constitutionally impermissible. Barnes maintains that a permanent injunction against future speech, whether issued before or after the conclusion of a defamation trial, is necessarily a prior restraint. If the permanent injunction is a prior restraint, we must then determine whether it overcomes the heavy presumption against its constitutionality. Kinney argues that defamatory speech is not protected and that enjoining its continuation is therefore permissible. Barnes responds that the presumption cannot be overcome because such injunctions pose too great a risk to free speech.

We first acknowledge the parties' arguments regarding whether Article I, Section 8 of the Texas Constitution affords greater free-speech protection than the First Amendment of the U.S. Constitution. *Compare* TEX. CONST. art. I, § 8 ("Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press."), *with* U.S. CONST. Amend. 1 ("Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ."). Barnes argues that we have consistently interpreted Texas's constitutional recognition of free-speech rights more broadly than its federal counterpart. *See Davenport*, 834 S.W.2d at 8–9 ("[O]ur free speech provision is broader than the First Amendment."). In *Operation Rescue–National v. Planned Parenthood of Houston and Southeast Texas, Inc.*, however, we clarified that "Article 1, Section 8 *may* be more protective of speech in some instances than the First Amendment, but if it is, it must

6

be because of the text. history. and purpose of the provision. not just simply *because*." 975 S.W.2d 546. 559 (Tex. 1998) (first emphasis added) (internal citation omitted). We further concluded: "We know of nothing to suggest that injunctions restricting speech should be judged by a different standard under the state constitution than the First Amendment." *Id.*

We need not determine whether the Texas Constitution provides greater protection than the First Amendment on the specific issue presented to us. as the U.S. Supreme Court has not definitively addressed it. Rather, we reiterate the unremarkable proposition that in interpreting our own constitution, we "should borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is deemed helpful, but should never feel compelled to parrot the federal judiciary." *Davenport,* 834 S.W.2d at 20. We look to federal cases for guidance, not as binding authority. *Id.*

### A. Classification of a Post-Adjudication Permanent Injunction Against Defamatory Speech as a Prior Restraint

The first issue we must dispose of is whether a permanent injunction prohibiting future speech related to statements that have been adjudicated defamatory is a prior restraint. If it is not, then our constitutional concerns regarding the use of prior restraints are inapplicable. This question highlights the distinction Kinney emphasizes between permanent injunctions on speech adjudicated defamatory and pretrial temporary injunctions on allegedly defamatory speech. Kinney argues that this distinction is meaningful. We disagree—as to the question presented, it is a distinction without a difference.

7

We have squarely held that a temporary injunction prohibiting allegedly defamatory speech is an unconstitutional prior restraint, but we have not specifically addressed the propriety of a post-adjudication permanent injunction in a defamation case. *See Hajek v. Bill Mowbray Motors, Inc.,* 647 S.W.2d 253, 255 (Tex. 1983) (per curiam). In *Hajek,* the plaintiff sought and obtained a temporary injunction restraining the defendant from driving his car around the community with a message painted on all four sides that Bill Mowbray Motors sold him a "lemon." *Id.* at 254. We reversed, holding that the injunction was a prior restraint in violation of the Texas Constitution. *Id.* at 255. Accordingly, we overturned the lower courts' decisions granting the injunction.

Our decision in *Hajek* rested on the well-settled legal principles laid out in *Ex parte Tucker.* In that case, the trial court enjoined the members of a worker's union from "vilifying, abusing, or using . . . epithets" against their employer. 220 S.W. 75, 75 (Tex. 1920). In overturning the injunction, we relied on the dichotomy between the Texas Constitution's affirmative grant of the liberty to speak without fear of curtailment and the commensurate responsibility inherent in that right. *Id.* at 76. We stated that "the abuse of the privilege . . . is not to be remedied by denial of the right to speak, but only by appropriate penalties for what is wrongfully spoken." *Id.* Accordingly, we held that the injunction was beyond the power of the trial court to issue. *Id.*

Kinney contends that *Hajek* and *Tucker* classify as prior restraints only temporary injunctions against speech that is alleged, but not proven, to be defamatory, and that these cases therefore do not apply to a post-adjudication permanent injunction. But our holding that the injunctions were prior restraints did not rest on their pretrial issuance. Rather, we took issue with the trial courts' decision

to remedy the defendants' abuse of their liberty to speak by preventing their future exercise of that liberty. *Id.*; *Hajek*, 647 S.W.2d at 255.

In this case, Kinney's request for injunctive relief may be broken down into two categories. First, as reflected in the pleadings, Kinney would have the trial court order Barnes to remove the statements at issue from his websites (and request that third-party republishers of the statements do the same) upon a final adjudication that the statements are defamatory. Such an injunction does not prohibit future speech, but instead effectively requires the erasure of past speech that has already been found to be unprotected in the context in which it was made. As such, it is accurately characterized as a remedy for one's abuse of the liberty to speak and is not a prior restraint. *See Hajek*, 647 S.W.2d at 255.[8]

As Kinney confirmed at oral argument, however, his request is not so limited. Kinney would also have the trial court permanently enjoin Barnes from making similar statements (in any form) in the future. That is the essence of prior restraint and conflates the issue of whether an injunction is a prior restraint with whether it is constitutional. As Professor Chemerinsky has aptly explained:

> Courts that have held that injunctions are not prior restraints if they follow a trial, or if they are directed to unprotected speech, are confusing the question of whether the injunction is a prior restraint with the issue of whether the injunction should be allowed. Injunctions are inherently prior restraints because they prevent future speech.

---

[8] Of course, the requirements for injunctive relief still must be met. A plaintiff must show that damages are inadequate or cannot otherwise be measured by any pecuniary standard. *Town of Palm Valley v. Johnson*, 87 S.W.3d 110, 111 (Tex. 2001)(per curiam). And aside from constitutional free-speech considerations, we also express no opinion on the propriety of an injunction that would order Barnes to seek removal of the statements from websites over which he has no control. We hold only that the constitutional concerns applicable to prior restraints are not present when the injunction is limited to requiring removal of a published statement that has been adjudicated defamatory.

Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 SYRACUSE L. REV. 157, 165 (2007); *see also Oakley, Inc. v. McWilliams*, 879 F. Supp. 2d 1087, 1089 (C.D. Cal. 2012) ("Injunctions against any speech, even libel, constitute prior restraints: they prevent[] speech before it occurs, by requiring court permission before that speech can be repeated." (citation and internal quotation marks omitted)). Even in the few cases in which the Supreme Court has upheld a content-based injunction against speech, it has not been because the injunction was not a prior restraint, but because under the circumstances the restraint was deemed constitutionally permissible. *See Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441–42 (1957) (beginning its analysis with the notion that "'the protection even as to previous restraint is not absolutely unlimited,'" while recognizing that "the limitation [on such protection] is the exception" (quoting *Near*, 283 U.S. at 716)). Accordingly, we hold that an injunction against future speech based on an adjudication that the same or similar statements have been adjudicated defamatory is a prior restraint.[9]

However, "[l]abeling respondents' action a prior restraint does not end the inquiry." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975). Notably, the U.S. Supreme Court has never approved a prior restraint in a defamation case. Chemerinsky, 57 SYRACUSE L. REV. at 167; *see, e.g., Near*, 283 U.S. at 706 (invalidating statute allowing courts to enjoin publication of future issues of newspaper because previous editions were found to be "'chiefly devoted to malicious, scandalous

---

[9] The lack of a dispositive distinction between temporary and permanent injunctions as to the second category of injunctive relief requested is highlighted by the requirements that must be satisfied to obtain a temporary injunction. An applicant must "plead and prove," among other things, "a probable right to the relief sought." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). Absent a showing of a likelihood of success on the merits, a temporary injunction may not issue. *In re Newton*, 146 S.W.3d 648, 652 (Tex. 2004). While the standard to prevail at trial is certainly higher, the effect of the permanent injunction is the same: speech is restrained before it occurs.

and defamatory articles'"). However, the Court has not decided whether the First Amendment prohibits the type of injunction at issue in this case, leaving that question unsettled.[10] Turning to the issue of whether the injunction against future speech sought by Kinney, though a prior restraint, is nevertheless permissible under the Texas Constitution, we hold that it is not.

## B. Prior Restraints on Future Speech Related to Statements That Have Been Adjudicated Defamatory Violate the Texas Constitution

Again, prior restraints bear a heavy presumption against their constitutionality. *Davenport v. Garcia*, 834 S.W.2d 4, 9 (Tex. 1992); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). The proponent of such restraints thus "carries a heavy burden of showing justification for the imposition of such a restraint." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). While prior restraints are plainly disfavored, however, the phrase itself is not a "self-wielding sword," but a demand for individual analyses of how prior restraints will operate. *Kingsley Books*, 354 U.S. at 441–42. In examining the propriety of injunctive relief, then, we bear in mind the category of speech sought to be enjoined and the effect of such relief on a person's liberty to speak freely.[11]

---

[10] The issue was presented to the Supreme Court in *Tory v. Cochran*, 544 U.S. 734 (2005). In that case, noted attorney Johnnie Cochran sued Ulysses Tory, a former client, after Tory began engaging in activities such as picketing Cochran's office and sending the attorney threatening letters due to Tory's dissatisfaction with Cochran's services. *Id.* at 735. Tory indicated that he would continue his activities barring a court order, and the trial court issued a permanent injunction against Tory's defamatory speech. *Id.* Tory appealed, presenting to the Supreme Court the very issue before us today. *Id.* at 737–38. However, Cochran died shortly after oral argument, and the Court sidestepped the question, holding that Cochran's death resulted in the injunction's "los[ing] its underlying rationale" of protecting Cochran from defamation. *Id.* at 738.

[11] The parties dispute whether Kinney waived his argument that defamatory speech is not "protected" speech under the Texas and U.S. Constitutions. We resolve this dispute by stating only that we cannot divorce the type and quality of speech at issue—in this case, defamatory speech—from the constitutionality of restraining it.

11

## 1. Texas Law Comports with the Traditional Rule That Injunctive Relief Is Not Available in Defamation Actions

"The traditional rule of Anglo-American law is that equity has no jurisdiction to enjoin defamation." Chemerinsky, 57 SYRACUSE L. REV. at 167 (explaining that the rule dates back to eighteenth-century England and was adopted "with remarkable uniformity" by nineteenth- and twentieth-century American courts); *see also, e.g., Kramer v. Thompson*, 947 F.2d 666, 677 (3d Cir. 1991) ("[T]he maxim that equity will not enjoin a libel has enjoyed nearly two centuries of widespread acceptance at common law."). Our treatment of the temporary injunctions in *Ex parte Tucker* and *Hajek*, and more recent decisions on prior restraints, leave no doubt that the current state of Texas law is in accordance with this traditional rule with regard to future speech.

We have indicated that a prior restraint may be permissible "only when essential to the avoidance of an impending danger," *Davenport*, 834 S.W.2d at 9, and only when it is the least restrictive means of preventing that harm, *Ex parte Tucci*, 859 S.W.2d 1, 6 (Tex. 1993); *see also Hajek*, 647 S.W.2d at 255; *Ex parte Tucker*, 220 S.W. at 76.[12] We explained in *Tucker* the significant distinction between curtailing a person's liberty of speech, which the Texas Constitution forbids, and penalizing a person's abuse of that liberty, which the Constitution allows:

> The purpose of [Article I, Section 8] is to preserve what we call 'liberty of speech' and 'the freedom of the press,' and at the same time hold all persons accountable to the law for the misuse of that liberty or freedom. Responsibility for the abuse of the privilege is as fully emphasized by its language as that the privilege itself shall be free from all species of restraint. But the abuse of the privilege, the

---

[12] Applying that concept in the context of reviewing a gag order, we held in *Davenport* that such an order "will withstand constitutional scrutiny only where there are specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm." 834 S.W.2d at 10.

12

provision commands, shall be dealt with in no other way. It is not to be remedied by denial of the right to speak, but only by appropriate penalties for what is wrongfully spoken. Punishment for the abuse of the right, not prevention of its exercise, is what the provision contemplates. There can be no liberty in the individual to speak, without the unhindered right to speak. It cannot co-exist with a power to compel his silence or fashion the form of his speech. Responsibility for the abuse of the right, in its nature pre-supposes freedom in the exercise of the right. It is a denial of the authority, anywhere, to prevent its exercise.

220 S.W. at 76. Citing *Tucker*, we plainly stated in *Hajek* that "[d]efamation alone is not a sufficient justification for restraining an individual's right to speak freely." 647 S.W.2d at 255. Our courts of appeals have continued to recognize that the appropriate remedy for defamation is damages, not injunctive relief. *See, e.g., Cullum v. White*, 399 S.W.3d 173, 189 (Tex. App.—San Antonio 2011, no pet.); *Brammer v. KB Home Lone Star, LP*, 114 S.W.3d 101, 108 (Tex. App.—Austin 2003, no pet.) ("Although the specific damages sustained from defamation and business disparagement-related activity is often difficult to measure, it is nonetheless well established that this type of harm does not rise to the level necessary for the prior restraint to withstand constitutional scrutiny.").

### 2. Injunctions Cannot Effectively Remedy the Harm Caused by Defamation Without Chilling Protected Speech

Contending that *Hajek* "ignored decades of intervening precedent from the U.S. Supreme Court," Kinney relies on Supreme Court case law upholding injunctions in the context of obscenity and commercial speech to argue that post-trial injunctions against defamatory speech are consistent with the First Amendment. In *Kingsley Books*, for example, the Supreme Court considered a New York statute that allowed municipalities to bar the continued sale of written and printed materials adjudicated obscene. 354 U.S. at 437. The Supreme Court upheld the statute, holding that it "studiously withholds restraint upon matters not already published and not yet found offensive." *Id.*

13

at 445. By contrast, the Court held, the statute struck down in *Near v. Minnesota* had empowered the courts "to enjoin the dissemination of future issues of a publication because its past issues had been found offensive." *Id.*

And in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, the Supreme Court upheld an administrative order prohibiting a newspaper from continuing to run gender-specific help-wanted ads pursuant to the enforcement of a local anti-discrimination law. 413 U.S. 376, 379 (1973). The Court concluded that the speech at issue constituted illegal commercial speech, holding that the injunction "d[id] not endanger arguably protected speech" and was therefore permissible. *Id.* at 390.

Even after these decisions, several courts addressing the issue presented here have continued to adhere to the traditional rule that defamation alone will not justify an injunction against future speech. *See Metro. Opera Ass'n v. Local 100*, 239 F.3d 172, 177 (2d Cir. 2001); *Oakley, Inc. v. McWilliams*, 879 F. Supp. 2d 1087, 1090 (C.D. Cal. 2012); *Tilton v. Capital Cities/ABC Inc.*, 827 F. Supp. 674, 681 (N.D. Okla. 1993) ("The fundamental law of libel in both Oklahoma and Texas is that monetary damages are an adequate and appropriate remedy and that injunctive relief is not available."); *New Era Publ'ns Int'l v. Henry Holt & Co.*, 695 F. Supp. 1493, 1525 (S.D.N.Y. 1988) ("[W]e accept as black letter that an injunction is not available to suppress defamatory speech."); *Demby v. English*, 667 So. 2d 350, 355 (Fla. Ct. App. 1995) (per curiam) (noting that the claim for injunctive relief was "frivolous" in light of the "well-established rule that equity will not enjoin either an actual or a threatened defamation" (citation and internal quotation marks omitted)); *Willing v. Mazzocone*, 393 A.2d 1155, 1157–58 (Pa. 1978) (holding that a permanent injunction against

defamatory speech violated a provision of the Pennsylvania Constitution that is substantially similar to Article I, Section 8 of the Texas Constitution). By contrast, a small number of states have cited the Supreme Court cases referenced above in holding that narrowly drawn, post-trial injunctions against defamatory speech are constitutional. *See Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302 (Ky. 2010); *St. James Healthcare v. Cole*, 178 P.3d 696 (Mont. 2008); *Balboa Island Vill. Inn, Inc. v. Lemen*, 156 P.3d 339 (Cal. 2007); *Retail Credit Co. v. Russell*, 218 S.E.2d 54 (Ga. 1975); *O'Brien v. Univ. Cmty. Tenants Union, Inc.*, 327 N.E.2d 753 (Ohio 1975); *see also Lothschuetz v. Carpenter*, 898 F.2d 1200 (6th Cir. 1990).

In *Balboa*, for example, the trial court found that Lemen had made defamatory statements about the Balboa Village Inn and issued a permanent injunction prohibiting her from engaging in numerous acts, including repeating those statements. 156 P.3d at 342. The California Supreme Court described *Kingsley Books* and *Pittsburgh Press* as holding that "an injunctive order prohibiting the repetition of expression that had been judicially determined to be unlawful did not constitute a prohibited prior restraint of speech." *Id.* at 346–47. The court concluded that, while the particular injunction at issue in *Balboa* was overbroad, a court may issue an injunction prohibiting a person from repeating statements that have been adjudicated defamatory following a trial on the merits. *Id.* at 349–50.

We do not read *Kingsley Books* and *Pittsburgh Press* so broadly and decline to extend their holdings to the defamation context. To that end, we agree with the district court in *Oakley* that injunctions against defamation are impermissible because they are necessarily "ineffective,

15

overbroad, or both." 879 F. Supp. 2d at 1090. That is, "[a]ny effective injunction will be overbroad, and any limited injunction will be ineffective." Chemerinsky, 57 SYRACUSE L. REV. at 171.

On the one hand, for any injunction to have meaning it must be effective in its purpose. *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 565 (1976) (assessing "the probable efficacy of prior restraint on publication as a workable method" of accomplishing its purpose); *N.Y. Times Co. v. United States*, 403 U.S. 713, 744 (1971) (Marshall, J., concurring) ("It is a traditional axiom of equity that a court of equity will not do a useless thing . . . ."). The narrowest of injunctions in a defamation case would enjoin the defamer from repeating the exact statement adjudicated defamatory. Such an order would only invite the defamer to engage in wordplay, tampering with the statement just enough to deliver the offensive message while nonetheless adhering to the letter of the injunction. Kinney admitted as much at oral argument, agreeing that the injunction he is seeking would extend to speech that was "substantially the same" or made "non-substantive changes" to the statement that has been adjudicated defamatory.

But expanding the reach of an injunction in this way triggers the problem of overbreadth. Overbroad restrictions on speech are unconstitutional because of their potential to chill protected speech. *See Comm'n for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 435 (Tex. 1998) ("An overbroad statute sweeps within its scope a wide range of both protected and non-protected expressive activity." (citation and internal quotation marks omitted)); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 237 (2002) ("The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process."). In the defamation context, the concern is that in prohibiting speech found to be

defamatory, the injunction unreasonably risks prohibiting nondefamatory speech as well. *See Lawson v. Murray*, 515 U.S. 1110, 1114 (1995) (Scalia, J., concurring in denial of writ of certiorari) ("The danger that speech-restricting injunctions may serve as a powerful means to suppress disfavored views is obvious enough even when they are based on a completed or impending violation of law.").

The particular difficulty in crafting a proper injunction against defamatory speech is rooted in the contextual nature of the tort. In evaluating whether a statement is defamatory, the court construes it "as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement." *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987). Given the inherently contextual nature of defamatory speech, even the most narrowly crafted of injunctions risks enjoining protected speech because the same statement made at a different time and in a different context may no longer be actionable. Untrue statements may later become true; unprivileged statements may later become privileged.

Kinney dismisses this concern, arguing that in such a scenario the defamer "could speak confident in the knowledge that [the enjoined statement is] no longer defamatory." But how confident could such a speaker be when he is bound by an injunction *not* to speak? The California Supreme Court suggested in *Balboa* that "[i]f such a change in circumstances occurs, [the] defendant may move the court to modify or dissolve the injunction." 156 P.3d at 353. We think it is no answer that a person must request the trial court's permission to speak truthfully in order to avoid being held in contempt. *See Pittsburgh Press*, 413 U.S. at 390 ("The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker,

17

before an adequate determination that it is unprotected by the First Amendment."); *see also Balboa,* 156 P.3d at 357 (Kennard, J., dissenting) ("Requiring a citizen to obtain government permission before speaking truthfully is 'the essence of censorship' directly at odds with the 'chief purpose' of the constitutional guarantee of free speech to prevent prior restraints." (quoting *Near,* 283 U.S. at 713, and *Kingsley Books,* 354 U.S. at 445)).

These concerns apply even more forcefully to an injunction that goes beyond restraining verbatim recitations of defamatory statements and encompasses statements that are "substantially similar." Subtle differences in speech will obscure the lines of such an injunction and make it exceedingly difficult to determine whether a statement falls within its parameters. *Balboa,* 156 P.3d at 356 (Kennard, J., dissenting in part); *Oakley,* 879 F. Supp. 2d at 1091 (noting that "a 'similar statement' standard would require a court enforcing the injunction to continuously decide whether new statements by a persistent defendant were sufficiently similar"). For example, let us imagine a trial court enjoins a defendant from repeating the defamatory statement "John Smith sells handguns to minors," as well as similar statements. Can the defamer state more generally that Smith is engaged in the business of illegal gun sales or that Smith's business contributes to the nationwide problems with school shootings? Can the word "handgun" be changed to "shotgun"?[13]

---

[13] The *Oakley* court proposed the following conundrum:

> If a court enjoined the word "thief," would related words like pilferer, looter, pillager, plunderer, poacher, and rustler also support the finding of willfulness necessary to hold the speaker in contempt? How about bandit? Pirate? What about phrases, e.g., "she was in the habit of converting other people's property to her own property?" Or further into abstraction, "she may take liberties with your property" or "count your silverware after she leaves your home?"

879 F. Supp. 2d at 1091.

These uncertainties highlight the inapplicability of the Supreme Court's obscenity cases. A permanent injunction restraining a theater owner from screening a film adjudicated to be obscene clearly applies only to that film, and others may be shown without the fear of contempt sanctions. *See Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 55–56 (1973) (upholding statute allowing civil injunction restraining exhibition of two films following adjudication that the films were obscene). *Pittsburgh Press*, while it involved commercial speech rather than obscenity, is similarly distinguishable. In that case, as noted above, the Supreme Court upheld an administrative order prohibiting a newspaper from continuing a practice of running gender-specific help-wanted ads pursuant to the enforcement of a local anti-discrimination law. 413 U.S. at 389–90. The Court stressed, however, that the order upheld could not be punished with contempt proceedings and "d[id] not endanger arguably protected speech" because it did not require speculation as to the effect of publication. *Id.* at 390 & n.14. As discussed above, this certainty does not translate to the defamation context, in which the task of crafting an effective injunction against future speech risks enjoining constitutionally protected speech to an unacceptable degree.

By contrast, no such concerns arise when courts issue speech-related injunctions that are not prior restraints, such as ordering the deletion of defamatory statements posted on a website. There is a legally cogent division between mandatory injunctions calling for the removal of speech that has been adjudicated defamatory and prohibitive injunctions disallowing its repetition. The latter impermissibly chills protected speech; the former does not. The distinction thus arms trial courts with an additional tool to protect defamed parties while ensuring the State does not infringe upon the fundamental right to free speech guaranteed by Article I, Section 8.

19

Accordingly, we hold that the Texas Constitution does not permit injunctions against future speech following an adjudication of defamation. Trial courts are simply not equipped to comport with the constitutional requirement not to chill protected speech in an attempt to effectively enjoin defamation. Instead, as discussed below, damages serve as the constitutionally permitted deterrent in defamation actions.

## C. Damages Are Generally the Proper Remedy for Defamation

In keeping with Texas's longstanding refusal to allow injunctions in defamation cases, the well-settled remedy for defamation in Texas is an award of damages. *Ex parte Tucker*, 220 S.W. at 75–76; *Cullum*, 399 S.W.3d at 189; *Brammer*, 114 S.W.3d at 108. This can include economic damages like lost income, noneconomic damages like loss of reputation and mental anguish, and even punitive damages upon a finding of actual malice. *Hancock v. Variyam*, 400 S.W.3d 59, 65–66 (Tex. 2013). And imposition of damages has long been held to be an effective tool against defamers. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964) ("The fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute.").

Kinney raises the concern that a victim of defamatory speech by a judgment-proof, serial defamer can obtain no remedy in damages. Damages may not deter the serial defamer, either because she lacks the funds to pay the damages or because she has so much money that paying a series of fines is immaterial to her. It is also easy to imagine a scenario in which an award of damages, even if collectible, will not provide complete relief to the defamed plaintiff. Imagine a statement falsely accusing a person of pedophilia, for example. Presumably, an order prohibiting the statement from being repeated would be of paramount importance to the plaintiff. This scenario

was discussed at length in *Balboa*, the logic of which does not escape us. 156 P.3d at 351 ("Thus, a judgment for money damages will not always give the plaintiff effective relief from a continuing pattern of defamation."). However, the constitutional protections afforded Texas citizens are not tied to their financial status. *See, e.g., id.* at 358 (Kennard, J., concurring) ("[N]either this nor any other court has ever held that a defendant's wealth can justify a prior restraint on the constitutional right to free speech."). As the Pennsylvania Supreme Court concluded in *Willing*, "[w]e cannot accept . . . that the exercise of the constitutional right to freely express one's opinion should be conditioned upon the economic status of the individual asserting that right." 393 A.2d at 1158. Yet, conditioning the allowance of prior restraints on a defendant's inability to pay a damage award would do just that.

Moreover, the concern that damages will not provide an effective remedy in defamation cases is not a new one, but we have never deemed it sufficient to justify a prior restraint. For example, in defamation *per se* cases, nominal damages, not injunctive relief, are awarded when actual damages are difficult to prove or are not claimed because "'the action is brought for the purpose of vindicating the plaintiff's character by a verdict of a jury that establishes the falsity of the defamatory matter.'" *Hancock*, 400 S.W.3d at 65 (quoting RESTATEMENT (SECOND) OF TORTS § 620 cmt. a (1977)). And the Supreme Court has expressly recognized that the potential inadequacy of damages as a remedy for defamation does not open the door to additional relief, stating: "The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem. Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22–23

21

(1990) (citation and internal quotation marks omitted). Applying the same reasoning, we too decline to open the door to prior restraints in this context.

## D. The Advent of the Internet

Finally, we address Kinney's argument that the Internet is a game-changer with respect to the issue presented because it "enables someone to defame his target to a vast audience in a matter of seconds." The same characteristics that have cemented the Internet's status as the world's greatest platform for the free exchange of ideas, *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997)—the ease and speed by which any person can take on the role of the town crier or pamphleteer—have also ignited the calls for its receiving lesser protection. *See, e.g.*, Lyrissa Barnett Lidsky, *Silencing John Doe: Defamation and Discourse in Cyberspace*, 49 DUKE L.J. 855, 863–64 (Feb. 2000).

However, the Supreme Court has steadfastly refused to make free speech protections a moving target, holding that "[w]e must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 326 (2010). And, with respect to the advent of the Internet, the Court has gone further in championing its role as an equalizer of speech and a gateway to amplified political discourse, holding in *Reno* that there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." 521 U.S. at 870. In this way, the Supreme Court has taken a definitive stance guaranteeing equal First Amendment protection for speech over the Internet. The Court has also recognized that damages, while "imperfect," are the remedy the law gives to defamation victims. *Milkovich*, 497 U.S. at 22–23

22

(citation and internal quotation marks omitted). We are not persuaded that the policy concerns that Kinney raises justify enjoining defamatory speech in a manner that substantially risks chilling constitutionally protected speech.

One final note is warranted in response to Kinney's assertion that the case for injunctive relief is made more compelling by the need to address the phenomena of cyber-bullying and online hate speech. It is enough to say that neither of those is at issue here. Today we simply continue to hold that "[d]efamation *alone* is not a sufficient justification for restraining an individual's right to speak freely." *Hajek*, 647 S.W.2d at 255 (emphasis added). But as discussed above, we have never held that all injunctions against future speech are *per se* unconstitutional, recognizing that they may be warranted to restrain speech that poses a threat of danger. *Id.* We need not and do not address the propriety of a requested injunction against speech that is not at issue, nor should we without analyzing the facts and circumstances underlying such a request.

### III. Conclusion

In evaluating whether state action exceeds constitutional bounds governing freedom of speech, courts "must give the benefit of any doubt to protecting rather than stifling speech." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469 (2007). We hold that, while a permanent injunction requiring the removal of posted speech that has been adjudicated defamatory is not a prior restraint, an injunction prohibiting future speech based on that adjudication impermissibly threatens to sweep protected speech into its prohibition and is an unconstitutional infringement on Texans' free-speech rights under Article I, Section 8 of the Texas Constitution. Because the trial court concluded that no injunction of any kind would be permissible, the court erred

23

in granting summary judgment to the extent Kinney's requested injunction did not constitute a prior restraint. We therefore reverse the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** August 29, 2014

D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JIMI ROSE,                        :        CIVIL ACTION
       Plaintiff, pro se        :
                       :
      vs.                         :
                       :
BRUCE ROTHROCK, et al.,           :
       Defendants               :        NO. 08-3884

### MEMORANDUM

PRATTER, J.                                                    APRIL 29, 2009

Pro Se Plaintiff Jimi Rose complains that Bruce and David Rothrock, as well as their

company Lehigh Valley Hospitality Group ("LVHG"), refused to honor a contract to sell him

property because of his race. Defendants filed three motions: a Motion to Dismiss, a Motion to

Seal the Complaint or Strike the Complaint of Scandalous and Impertinent Material, and a

Motion for Sanctions Pursuant to Rule 11. As set forth below in detail, the various motions are

granted in part and denied in part.

### FACTUAL AND PROCEDURAL BACKGROUND

The following facts are drawn from the Plaintiff's Complaint. Mr. Rose claims that in

November 2007 he entered into negotiations with David Rothrock, an owner and operator of

LVHG, to purchase real estate at 300 W. Hamilton Street in Allentown, Pennsylvania. He

alleges that the parties orally agreed to a price of $1,200,000, which David Rothrock told him

was a reduction from $1,600,000. Relying upon this agreement, Mr. Rose secured financing for

the purchase of the property. He attaches as Exhibit A to his Complaint a letter that he wrote to

David Rothrock which he claims proves that he had an oral agreement with David Rothrock to

1

purchase the property.

---

The letter from Mr. Rose to Mr. David Rothrock is dated December 30. 2007. and reads in full:

Re: Agreement for sale of Banana Joe's
Dear Dave:

Several weeks ago, you told me that the bar was for sale for $1.2 million, without the liquor license, and would be $1.375 million with the liquor license. I then faxed you an offer of 1.2 million which would also include the liquor license. Since this offer to you, I was advised that you and your father lost the liquor license. This would mean that my offer would go to 1 million dollars without the liquor license. I am fully aware that your father only paid about $400,000 for the property, and I believe that a 1 million dollar offer is more than generous since, as you put it, you and your family did not want to be in the nightclub business.

On December 4, 2007, at approximately 2:06PM, I receive a telephone call from your father Bruce, who made it appear to me that you were retarded and didn't know what you were talking about when you quoted a price of $1.2 million for Banana Joe's without a liquor license. You [sic] father offered to take me to dinner on that Wednesday; I told him that I had a meeting in Harrisburg on Wednesday, but that I would take him up on his offer on Thursday. Since that time, however, my schedule became extremely busy. It has not been until now that I have had the opportunity to deal with your father's outlandish offer.

Your father told me that you didn't know what you were talking about, and that the property was for sale for $2.2 million. I found this to be extremely bizarre, since you told me that you were initially asking $1.6 million for the property, and you recently reduced the price to $1.2 million without the liquor license and $175,000 for the liquor license. Secondly, I don't believe that you became CEO of your father's company without knowing numbers and without knowing what you were talking about. In addition, you are an attorney, and a very good one at that. Above all this, you are a gentleman, one whom I have admired over the years.

I am appalled and I am offended that you [sic] father would call me and offer to take me out to dinner, in an attempt to make my transaction with you go away. My people had $1.2 million on hand to buy this business and property. The way I see it, with respect to the liquor license and the Liquor Control Board, your father needs all the friends he can get. You told me that the mayor would make sure that if you lost the current liquor license, he would make sure that you got another liquor license. It's apparent to me that Mayor Pawlowski is being extremely generous with liquor licenses that are retained by the Liquor Control Board.

Even though you and I didn't shake hands. a deal is still a deal. I know your father was very serious about buying me dinner, because he gave me his home number for me to call him. This indicates that he is doing everything to appease me and to get me to back away from the deal. They have a name for what your father is attempting to do: bait and switch. Even though I

2

On December 4, 2007, Bruce Rothrock, LVHG's other owner and operator, spoke with Mr. Rose and confirmed the agreement but "unilaterally" changed the price to $2,200,000, claiming that David had been confused about the price. Thus, Mr. Rose claims, the Defendants breached their oral agreement to sell him the property. Mr. Rose believes that Bruce Rothrock raised the purchase price when he discovered that Mr. Rose is African American and was capable of paying the original agreed-upon price. Mr. Rose claims that both Messrs. Rothrock knew that he was black prior to agreeing to the sale. He claims to have witnesses to both the oral agreement and the telephone call during which the price was raised. Mr. Rose also alleges that Bruce and David Rothrock conspired to violate his civil rights with other "unknown persons." Compl. at ¶ 27-28.

Mr. Rose's Complaint provides some very colorful allegations that the Rothrocks' treatment of him was discriminatory. Mr. Rose submits that because the Defendants have not identified any other potential buyers, their refusal to sell to him must have been because of his race, not because of competing offers. He notes that the Defendants paid $400,000 for the property originally. He claims that the family of a young African American who was murdered on Rothrock property "might be filing a wrongful death action against Defendants," and that the

---

feel as though I've been victimized, I am hopeful that you will do everything in your power to correct this misunderstanding on the part of your father. I have been extremely distraught and emotionally despondent over this deceptive bait-and-switch game.

I sincerely hope that we can get this matter straightened out, so as to avoid a future confrontation. Thank you so very much for your time and attention, as I shall remain,

Respectfully yours,
Jimi Rose

3

Rothrocks blame the loss of their liquor license (presumably for the night club situated at the property involved in this dispute) on the "bad behavior" of African Americans on their property, including the incident related to the alleged murder on their property. Compl. at ¶¶ 33-34. He alleges that he will call "white persons" at trial who will testify that the Defendants' actions with respect to the sale of the property were discriminatory. Mr. Rose further alleges that the Defendants do not employ any minorities and have no history of selling to African Americans.

Mr. Rose originally filed a complaint against the Defendants in state court but later withdrew that complaint when he decided that federal court was a more appropriate forum. He also filed a lis pendens against the property in state court, which was dismissed. Defendants brought suit against Mr. Rose to recover attorneys' fees, presumably with regard to the withdrawn state court action and/or the dismissed lis pendens action, and Mr. Rose cites this as a further attempt by the Defendants to punish him for exercising his constitutional rights under the First Amendment and for being African American.

Mr. Rose's Complaint contains two counts. The first cites violations of 42 U.S.C. §§ 1981, 1982, and 1985, for which he claims damages, including lost profits amounting to $1,500,000 a year, expenses incurred in securing investors, emotional damages for public humiliation, punitive damages, pre-judgment interest, and costs and fees. In Count 2, Mr. Rose asserts a claim for breach of contract, for which he claims damages for lost profits amounting to $1,500,000 a year, expenses incurred in securing investors, punitive damages, pre-judgment interest, and costs and fees.

The Court will address each of the Defendants' three motions in turn.

Rothrocks blame the loss of their liquor license (presumably for the night club situated at the property involved in this dispute) on the "bad behavior" of African Americans on their property, including the incident related to the alleged murder on their property. Compl. at ¶¶ 33-34. He alleges that he will call "white persons" at trial who will testify that the Defendants' actions with respect to the sale of the property were discriminatory. Mr. Rose further alleges that the Defendants do not employ any minorities and have no history of selling to African Americans.

Mr. Rose originally filed a complaint against the Defendants in state court but later withdrew that complaint when he decided that federal court was a more appropriate forum. He also filed a <u>lis</u> pendens against the property in state court, which was dismissed. Defendants brought suit against Mr. Rose to recover attorneys' fees, presumably with regard to the withdrawn state court action and/or the dismissed <u>lis</u> pendens action, and Mr. Rose cites this as a further attempt by the Defendants to punish him for exercising his constitutional rights under the First Amendment and for being African American.

Mr. Rose's Complaint contains two counts. The first cites violations of 42 U.S.C. §§ 1981, 1982, and 1985, for which he claims damages, including lost profits amounting to $1,500,000 a year, expenses incurred in securing investors, emotional damages for public humiliation, punitive damages, pre-judgment interest, and costs and fees. In Count 2, Mr. Rose asserts a claim for breach of contract, for which he claims damages for lost profits amounting to $1,500,000 a year, expenses incurred in securing investors, punitive damages, pre-judgment interest, and costs and fees.

The Court will address each of the Defendants' three motions in turn.

A.    *Motion to Dismiss*

4

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (quoting Conley, 355 U.S. at 47). While a complaint need not contain detailed factual allegations, the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65 (citations omitted). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 1965 (citations omitted).

In making such a determination, courts "must only consider those facts alleged in the complaint and accept all of those allegations as true." ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994) (citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)); see also Twombly, 127 S. Ct. at 1965 (stating that courts must assume that "all the allegations in the complaint are true (even if doubtful in fact)"). The Court must also accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party. Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). The Court, however, need not accept as true "unsupported conclusions and unwarranted inferences," Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 183-84 (3d Cir. 2000) (citing City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n.13 (3d Cir. 1998)), or the plaintiff's "bald assertions" or "legal conclusions," Morse v. Lower Merion Sch. Dist., 132 F.3d.

902. 906 (3d Cir. 1997).

To evaluate a motion to dismiss. the Court may consider the allegations contained in the complaint. exhibits attached to the complaint, matters of public record and records of which the Court may take judicial notice. See Tellabs, Inc. v. Makor Issues & Rts., 127 S. Ct. 2499, 2509 (2007); Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).

In the case of pro se pleadings, like the Complaint in this case, such pleadings are liberally construed and "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Braithwaite v. Correctional Medical Services, et al., Civil Action No. 07-6, 2008 U.S. Dist. LEXIS 9821, at *3-4 (D. Del. Feb. 11, 2008) (quoting Erickson v. Pardus, --U.S.--, 127 S. Ct. 2197, 2200 (2007) (citations omitted)).

## 1. Section 1981

To state a claim under 42 U.S.C. § 1981. a plaintiff must allege (1) that the plaintiff is a member of a racial minority, (2) an intent to discriminate on the basis of race by the defendants, and (3) discrimination concerning one or more of the activities enumerated in the statute, which includes the right to make and enforce contracts. Brown v. Philip Morris, Inc., 250 F.3d 789, 797 (3d Cir. 2001). To bring a claim under § 1981, "a contractual relationship need not already exist because § 1981 protects the would-be contractor along with those who already have made contracts." Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006).

Defendants argue that Mr. Rose has not sufficiently alleged the second prong–an intent to discriminate on the basis of race by the Defendants. They contend that Mr. Rose's allegation that "[b]oth Rothrocks knew that Plaintiff was black, prior to reaching an agreement with the

Plaintiff." Compl. at ¶ 16, contradicts his claim that the Rothrocks raised the purchase price because of his race.[2] The Defendants cite Brown, 250 F.3d at 797, as an example of a case in which the Third Circuit Court of Appeals upheld the dismissal of a § 1981 claim when the plaintiffs did not aver that the defendants engaged in a discriminatory refusal to deal or claim that the defendants treated African Americans differently from Caucasians. They also direct the Court to Stehney v. Perry, 101 F.3d 925, 938 (3d Cir. 1996), in which the Third Circuit Court of Appeals affirmed the dismissal of an equal protection claim when the plaintiff failed to allege a discriminatory purpose behind a facially neutral policy.

These cases are easily distinguishable from the case at hand. In Brown, the plaintiffs sued tobacco companies because they claimed that the companies targeted African Americans in their marketing of menthol cigarettes, which is a completely different type of claim than the one here in which Mr. Rose claims that the Defendants refused to honor an agreement to sell real estate to him because of his race. See Brown, 250 F.3d at 793. Thus, while it is true, as Defendants say, that the Brown plaintiffs did not aver that the defendants engaged in a discriminatory refusal to deal or claim that the defendants treated African Americans differently from Caucasians, unlike Mr. Rose the plaintiffs in Brown did not even attempt to allege such claims. As for Stehney, again it appears that the plaintiff there did not even attempt to allege that a facially neutral policy

_____

[2] Whether the Rothrocks found out before the alleged oral agreement or after makes no difference. Obviously, if the Defendants agreed to sell property to the Plaintiff and, upon learning that he is African American, repudiated the agreement because of his race, that would be discriminatory. However, it would also be discriminatory to make an agreement with the Plaintiff, knowing his race but believing him to be incapable of actually raising enough money to meet the agreement, and then to change the terms after it became apparent that the Plaintiff could raise the money. Mr. Rose's Complaint could be read to be alleging the latter scenario. See Compl. at ¶ 15, 64.

7

was adopted "because of" its disproportionate effect on women. Id. at 937-38.

Mr. Rose counters that several paragraphs in his complaint allege facts supporting an intent to discriminate. He cites paragraphs 29 (the Defendants denied the Plaintiff an equal opportunity because of his race), 30 (the Defendants had no other offers, so their refusal to sell to the Plaintiff must have been because of race), 37 (the Plaintiff has witnesses who will testify that the Defendants discriminated on the basis of race with respect to selling the property), 48 (Bruce and David Rothrock "lack training in dealing with minorities" and the Plaintiff was consequently injured; the damage to Plaintiff by Defendants was "premeditated"), and 72 (the Defendants refused to sell the property to Mr. Rose because of his skin color). The Court also notes that Mr. Rose claims that the Defendants "have no history of selling to black people," Compl. at ¶ 50; that the "purpose of [Defendants'] real estate transactions is to bring and cause injury to minorities," Compl. at ¶ 58; and that "the Defendants have all but excluded minorities from all of their businesses," Compl. at ¶ 60. Whether the Plaintiff will be able to prove any of these allegations at a later stage of this case is not for the Court to decide at this time. Given that the Court must accept Mr. Rose's allegations as true and that pro se complaints should be liberally construed, Mr. Rose has alleged enough regarding the Defendants' allegedly discriminatory intent to survive a motion to dismiss. See, e.g., Allen v. Washington Hosp., Civil Action No. 96-1950, 1997 U.S. Dist. LEXIS 14606, at *5-6 (W.D. Pa. May 30, 1997) (denying motion to dismiss when plaintiff alleged that the defendants refused to provide him with an application for appointment to a medical staff position solely because of race); Tucker v. Merck & Co., No. Civ. A. 03-5015, 2004 WL 350467, at *3 (E.D. Pa. Feb. 18, 2004) (holding that second prong was satisfied when "complaint explicitly alleges that defendant intentionally discriminated against [plaintiff] on the

basis of race").

**2.    Section 1982**

Section 1982 prohibits racial discrimination in transactions relating to real and personal property by securing the right of all citizens to "inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. Much like claims under § 1981, to state a claim under 42 U.S.C. § 1982, a plaintiff must allege "1) the defendant's racial animus; 2) intentional discrimination; and 3) that the defendant deprived plaintiff of his rights because of race." Brown, 250 F.3d at 797 (3d Cir. 2001) (internal citations omitted). These elements are "virtually identical" to those of § 1981. See Soo San Choi v. D'Appolonia, 252 F.R.D. 266, 272 (W.D. Pa. 2008). Not surprisingly, then, the Defendants set forth the same arguments regarding the insufficiency of Mr. Rose's § 1982 claim as they did regarding the insufficiency of his § 1981 claim, and those arguments must fail for the same reasons as they did with regard to that claim.

**3.    Section 1985**

Section 1985(3) allows claims by plaintiffs who are injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To state a § 1985(3) claim, a plaintiff must sufficiently allege:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;[3] and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

---

[3] To satisfy this element, a plaintiff must allege racial animus, similar the requirement under both § 1981 and § 1982. Farber v. City of Paterson, 440 F.3d 131, 135 (3d Cir. 2006) (citing Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)).

9

Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2006) (internal quotations omitted).

The Defendants contend that Mr. Rose's § 1985(3) claim must fail because a violation of § 1981 or § 1982 can not support a § 1985(3) claim against private actors. They cite Brown v. Philip Morris, Inc., 250 F.3d 789 (3d Cir. 2001), as support.

The Brown Court stated that "in the context of actions brought against private conspirators, the Supreme Court has thus far recognized only two rights protected under § 1985(3): the right to be free from involuntary servitude and the right to interstate travel." Id. at 805. The court of appeals notes that the "great weight of precedential authority" suggests that violations of federal statutes like §§ 1981 and 1982 may not form the basis of a § 1985(3) action. Id. at 806. These statements are dicta, however, and therefore are merely persuasive as opposed to controlling. A subsequent unpublished case, Magnum v. Archdiocese of Philadelphia, 253 Fed. Appx. 224, 230 (3d Cir. 2007), cited this reasoning from Brown with approval, however, and held that plaintiffs' failure to allege any violations of constitutional rights protected against private encroachment doomed their § 1985(3) claim.

Several courts in this district have also used the reasoning in Brown to support their dismissal of § 1985(3) claims. See, e.g., Collins v. Christie, Civil Action No. 06-4702, 2007 WL 2407105, at *11 (E.D. Pa. Aug. 22, 2007) (dismissing § 1985(3) claim that was based on § 1981 violation because of the "strong language of the Court of Appeals" supporting such a holding); McLease v. R.R. Donnelley & Sons Co., 226 F. Supp. 2d 695, 702 (E.D. Pa. 2002) (dismissing § 1985(3) that was based on § 1981 in light of the "grave doubt" cast upon such a claim by the Third Circuit Court of Appeals); Dixon v. Boscov's, Inc., No. CIV. A. 02-1222, 2002 WL 1740583, at *2-3 (E.D. Pa. July 17, 2002) (adopting Brown's dicta and dismissing § 1985(3)

10

claim that was based on a § 1981 claim). But see Abdulhay v. Bethlehem Medical Arts, L.P., No. Civ. A. 03-CV-04347, 2004 WL 620127, at *6-9 (E.D. Pa. Mar. 29, 2004) (noting that restrictions on the basis of § 1985(3) claims in Brown were part of dicta and allowing § 1985(3) claim based on § 1981 and/or § 1982).

This Court elects to follow the logic and persuasive power of Brown's dicta, and will therefore dismiss Mr. Rose's § 1985(3) claim.

## 4. Breach of Contract

Defendants also challenge the sufficiency of Mr. Rose's breach of contract claim. As an initial matter they note that contracts for sale of real property must be in writing to comply with the statute of frauds. See Defs.' Mot. to Dismiss at 14, citing Hostetter v. Hoover, 547 A.2d 1247, 1250 (Pa. Super. 1988). Mr. Rose acknowledges this, but notes that while an oral contract for the sale of land may not be specifically enforced, it can still form the basis for the recovery of damages. See Empire Properties, Inc. v. Equireal, Inc., 674 A.2d 297, 301 (Pa. Super. 1996).

In either case, the Plaintiff must still sufficiently plead the existence of a contract. It is hornbook law that "[a] contract is formed when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity." Weavertown Transport Leasing, Inc. v. Moran, 834 A.2d 1169, 1172 (Pa. Super. 2003). Although Mr. Rose does state in his Complaint that he reached an oral agreement with Defendant David Rothrock before Bruce Rothrock called and raised the price on the property in breach of the alleged agreement, Mr. Rose attaches as an exhibit to his Complaint his own letter which contradicts his allegation of agreement. That letter, set forth in full supra at n.1, demonstrates that, at most, David Rothrock made an offer to Mr. Rose, and Mr. Rose made two counteroffers

11

that apparently were not accepted. Indeed, the fact that Mr. Rose made an additional counteroffer after his offer of $1.2 million "without the liquor license" shows that there was no agreement between the parties for the sale of the property at $1.2 million, with or without a liquor license. While the Court must accept as true all allegations in a Complaint, it is not obliged to ignore exhibits that directly contradict those allegations, especially inasmuch as a Plaintiff himself has authored and offered the exhibit. See, e.g., WP 851 Assoc., L.P. v. Wachovia Bank, N.A., Civil Action No. 07-2374, 2008 WL 114992, at *8-9 (E.D. Pa. Jan. 10, 2008) (dismissing a claim when an exhibit attached to the complaint contradicted the allegations in the complaint); Centrella v. Barth, 633 F. Supp. 1016, 1019 (E.D. Pa. 1986) ("We accept as true the allegations of the complaint insofar as they are specific, factual and not contradicted by plaintiff's exhibits.") Because the Complaint, including exhibits, does not sufficiently allege the existence of a contract, Mr. Rose's claim for breach of contract must be dismissed.

CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted with regard to Mr. Rose's breach of contract and § 1985(3) claims and denied with regard to Mr. Rose's §§ 1981 and 1982 claims.

B.      *Motion to Seal the Complaint or to Strike the Complaint of Scandalous and Impertinent Material*

LEGAL STANDARD

There is a "'strong presumption' of openness" with regard to access to judicial records, and "[t]he party seeking to seal any part of a judicial record bears the heavy burden of showing that the 'material is the kind of information that courts will protect' and that 'disclosure will

12

work a clearly defined and serious injury to the party seeking closure.'" Miller v. Indiana Hosp., 16 F.3d 549, 551 (3d Cir. 1994) (quoting Publicker Indus., Inc. v. Cohen, 773 F.2d 1059, 1071 (3d Cir. 1984)). "The injury must be shown with specificity." Publicker, 773 F.3d at 1071. In deciding a motion to seal, a district court must make specific findings regarding the interest to be protected and must ensure that any order sealing a proceeding is narrowly tailored to serve that interest. Id. The Third Circuit Court of Appeals has set forth several considerations for district courts deciding such motions, including the parties' interest in privacy, whether the disclosure will cause embarrassment, whether the information is important to public health and safety, whether any party involved is a public official, and whether the case involves issues important to the public. Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995) (citing Pansy v. Borough of Stroudsburg, 23 F.3d 772, 787-91 (3d Cir. 1994)).

Under Rule 12(f) of the Federal Rules of Civil Procedure, "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter." "The purpose of a motion to strike is to simplify the pleadings and save time and expense by excising from a plaintiff's complaint any redundant, immaterial, impertinent or scandalous matter which will not have any possible bearing on the outcome of the litigation." Garlanger v. Verbeke, 223 F. Supp. 2d 596, 609 (D.N.J. 2002) (quoting Bristol-Myers Squibb Co. v. Ivax Corp., 77 F. Supp. 2d 606, 619 (D.N.J. 2000)). However, motions to strike are generally viewed with disfavor by the courts and "are often not granted if there is an absence of showing of prejudice to the moving party." Great W. Life Assurance Co. v. Levithan, 834 F. Supp. 858, 864 (E.D. Pa. 1993). Striking a pleading is a "drastic remedy" appropriate only when the grounds for striking are "readily apparent from the face of the pleadings." Johnson v.

13

Anhorn, 334 F. Supp. 2d 802, 809 (E.D. Pa. 2004) (internal citations omitted).

To prevail, the moving party must demonstrate that "the allegations have no possible relation to the controversy and may cause prejudice to one of the parties or [that] the allegations confuse the issues." River Road Development Corp. v. Carlson Corporation-Northeast, No. 89-7037, 1990 WL 69085, at *3 (E.D. Pa. May 23, 1990) (citing 5C C. Wright & A. Miller, Federal Practice and Procedure, § 1382, at 809-10, 815 (1969)).

## DISCUSSION

Defendants argue that the Court should seal the Complaint in this case because, despite the common law right of public access to court records, allowing this Complaint to remain unsealed would work a serious injury to their personal and professional reputations. They characterize the Complaint as a "hateful attack designed to continue [Plaintiff's] pattern of abusing the legal system to harass and embarrass Defendants." Defs.' Mot. to Seal or Strike at 6. They contend that by not sealing the Complaint, the Court will allow the use of baseless rumors as tools for extortion. Mr. Rose has not responded to this motion.

The Defendants cite to a number of cases to support their position, all of which are distinguishable to at least some extent and at least one of which actually weighs against granting the Defendants' motion to seal. For instance, Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157 (3d Cir. 1993), which Defendants cite in arguing that the "real chance of embarrassment and public harm to Defendants' reputation and business are sufficient reasons for sealing Plaintiff's Complaint," Defs.' Mot. to Seal and/or Strike at 6, involved documents containing trade secrets and other confidential business information, a category of information for which the potential harm of disclosure is widely recognized. See Leucadia, 998 F.2d at 166;

14

see also Fed. R. Civ. P. 26(c)(7) (specifically mentioning trade secrets as a category of information which may be covered by a protective order). Defendants also cite U.S. v. Smith, 776 F.2d 1104 (3d Cir. 1985), and U.S. v. Kemp, 365 F. Supp. 2d 618 (E.D. Pa. 2005), as examples of cases in which interests in privacy and reputation override the public's right of access to court records. Those cases, however, involve the reputations of third parties who "would have no meaningful opportunity to respond" to any allegations of criminal activity because they were not part of the case, Smith 776 F.2d at 1107, and grand jury materials and communications protected from public disclosure by Title III, Kemp, 365 F. Supp. 2d at 620. The Defendants in this case have every opportunity to respond on the record to the allegations in the Complaint, and this Complaint clearly is not subject to any statutes protecting it from disclosure, as was the case with the materials involved in the Kemp case.[4]

Defendants quote from Dombrowski v. Bell Atlantic Corp., 128 F. Supp. 2d 216 (E.D. Pa. 2000), to support their argument that serious embarrassment may be enough to entitle a party to the protection from disclosure of judicial records, but the Dombrowski court also pointed out that:

> [w]hile the defendants and some of their employees may well be embarrassed by the unsealing of the non-privileged paragraphs of the complaint, we do not believe that it is sufficient here to meet the good cause requirement in Pansy. Indeed. pleadings are filed every day with allegations that may embarrass the opposing party. If mere embarrassment were enough, countless pleadings as well as other judicial records would be kept from public view.

---

[4] Doe v. Shapiro, 852 F. Supp. 1256 (E.D. Pa. 1994), comes closer to the case at hand, in that Doe involved private citizens engaged in a conflict that had no particular public interest or effect on public health and safety. However, Doe involved more than disputed allegations of bad conduct–it involved private medical information (i.e., information about the plaintiff's AIDS diagnosis) that was not in dispute. See id. at 1257.

15

Id. at 219 (holding that other than a few paragraphs containing information protected by the attorney-client privilege, the complaint would not be sealed). Similarly, in Rossi v. Schlarbaum, Civil Action No. 07-3792, 2008 WI 222323 (E.D. Pa. Jan. 25, 2008) (not cited by the Defendants), despite the "highly-charged" nature of the litigation and the potential that the allowing "highly personal" facts to become public could produce "unnecessary shame and embarrassment," "damage to reputation, friendships, and family life," and destroy the defendants' "personal and professional lives," the court found that the defendants had failed to establish good cause to seal the record. Id. at *1-3 (internal quotations omitted). In that case, as in this one, the defendants alleged that the case was being used merely to "defame [the defendants] and to pressure them to settle, irrespective of the merits of the case." Id. at *1.

On balance, the Defendants arguments for sealing the Complaint do not outweigh the strong presumption of openness of judicial records. The Defendants have not shown that this highly contentious and emotionally charged litigation is any different from the other discrimination cases filed with great frequency in federal court such that they are any more susceptible to embarrassment and humiliation than any other defendant in such a case. Therefore, the Court will not order that the Complaint be placed under seal.

As to the Defendants' Motion to Strike,[5] the Defendants argue that 27 paragraphs of the Complaint "contain malicious lies and hateful rhetoric, which are scandalous, immaterial and impertinent to this case." Defs.' Mot. to Seal or Strike at 8-10. The Defendants do not detail individually why each of these 27 paragraphs should be struck. While it is obvious that at least some of the paragraphs the Defendants identify are immaterial and use "repulsive language" and

_____

[5] Again, Mr. Rose did not respond to this motion.

16

"detract from the dignity of the court," as to other paragraphs the Defendants have failed to carry the burden of demonstrating that those other paragraphs must be struck. Thus, because of their extraneous and inflammatory hyperbole,⁶ the Court will strike the following paragraphs or portions thereof: the last sentence of paragraph 25, the last sentence of paragraph 32, the second sentence of paragraph 58, all of paragraph 61, and all of paragraph 70. As to the other 22 paragraphs with which the Defendants take issue, the Court will deny this motion without prejudice to Defendants to re-file a motion specifically detailing why they believe that each of those paragraphs also should be struck.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Seal or Strike is granted in part and denied in part.

### C.    *Motion for Sanctions*

#### LEGAL STANDARD

Under Rule 11(b) of the Federal Rules of Civil Procedure:

By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for

---

⁶ Mr. Rose is urged to consider carefully his obligation as a pro se litigant in this Court to comport himself with civility at all times. He, just as any counseled litigant, may not use the court for uncontrolled "venting" and, like attorneys, he must adhere to the rules of the Court.

17

establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). A party may move for sanctions if the opposing party violates this rule, the movant provides that opposing party with notice, and the opposing party fails to withdraw the offending pleading or motion within 21 days of service of the notice. Fed. R. Civ. P. 11(c). "Rule 11 is intended for only exceptional circumstances." Morristown Daily Record, Inc. v. Graphic Comm. Union, Local 8N, 832 F.2d 31, 32 n.1 (3d Cir. 1987). The appropriate standard for review is whether the litigant or attorney acted reasonably under the circumstances. Gaiardo v. Ethyl Corp., 835 F.2d 479, 482 (3d Cir. 1987).

**DISCUSSION**

In their Motion for Sanctions, Defendants for the most part reiterate the arguments from their Motion to Dismiss, this time framing them as reasons why Mr. Rose's Complaint is frivolous. They also add that they believe that Mr. Rose filed his Complaint merely to harass them. As evidence, they attach a letter from Mr. Rose to the Rothrocks, in which Mr. Rose threatens to sue the Rothrocks and their attorney if they sue him. Defs.' Mot. for Sanctions at Ex. B. In the letter, Mr. Rose, in the midst of rather colorful and sometimes threatening language, notes that he withdrew his Lehigh County action in favor of pursuing his claims in federal court. Id. Defendants interpret this letter as evidence that Mr. Rose sued them merely to harass them and charge that he is a serial litigator.

18

Mr. Rose counters that the Defendants' motion is nothing more than an attempt to pressure him to drop his legitimate case against them. He stands by his arguments in opposition to the Defendants' Motion to Dismiss and argues that he, and not the Defendants, is the one who is subject to harassment. He does not deny that the Defendants followed procedure and served him with a copy of the motion, giving him a chance to withdraw his Complaint before the motion for sanctions was actually filed.

At this stage of the case, the Defendants' Motion for Sanctions is premature. The Defendants have not yet presented evidence that the Plaintiff's allegations are actually false and that Mr. Rose knew or should have known that when he filed the Complaint. Because two of Mr. Rose's four claims have survived the Motion to Dismiss, the Court can not say that the Complaint was frivolous as filed. Thus, the Court will deny the Defendants' Motion for Sanctions, without prejudice to re-file at a later date if appropriate.

CONCLUSION

For the foregoing reasons. Defendants' Motion for Sanctions is denied.

An Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

20

JIMI ROSE,                                  :        CIVIL ACTION
                    Plaintiff, pro se       :
                                            :
          vs.                               :
                                            :
BRUCE ROTHROCK, et al.,                     :
                    Defendants              :        NO. 08-3884

## O R D E R

AND NOW, this 29th day of April, 2009, upon consideration of Defendants' Motion to Dismiss (Docket No. 4), Defendants' Motion to Seal the Complaint or to Strike the Complaint of Scandalous and Impertinent Material (Docket No. 7), Defendants' Motion for Sanctions (Docket No. 9), and Plaintiff's responses to Defendants' Motions to Dismiss and for Sanctions (Docket Nos. 5, 11, 12), **IT IS HEREBY ORDERED** that:

1.    Defendants' Motion to Dismiss (Docket No. 4) is **GRANTED** in part and **DENIED** in part. Plaintiff's claims under § 1985(3) and for breach of contract are **DISMISSED**.

2.    Defendants' Motion to Seal the Complaint or to Strike the Complaint of Scandalous and Impertinent Material (Docket No. 7) is **GRANTED** in part and **DENIED** in part. The Defendants' Motion to Seal the Complaint is **DENIED**. As to the Defendants' Motion to Strike the Complaint of Scandalous and Impertinent Material, it is **GRANTED** as to the last sentence of paragraph 25, the last sentence of paragraph 32, the second sentence of paragraph 58, all of paragraph 61, and all of paragraph 70 and **DENIED** without prejudice as to the

21

remaining paragraphs identified in the Motion.

3.    Defendants' Motion for Sanctions (Docket No. 9) is **DENIED** without prejudice.


BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| STEPHEN P. WALLACE, et. al., | ) | CASE NO. 4:06CV3214 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JAMES M. KELLEY, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the Defendants', The Trust of Oklahoma (Trust Company) and Ronald J. Saffa, Motion for Release or Discharge of Lis Pendens, Award of Attorney's Fees and for an Injunction (Filing No. 69), Plaintiff Stephen P. Wallace's Objection (Filing No. 72), and Plaintiff Edith Jackson's Objection and Motion to Strike (Filing No. 75).

## FACTUAL BACKGROUND

Plaintiffs filed this action on September 12, 2006, asserting violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (RICO) and various state law claims. (Filing No. 1). On December 18, 2006, this Court entered a Memorandum and Order granting the Defendants' Motion to Dismiss, finding that the Plaintiffs failed to state a claim upon which relief may be granted on the alleged violation of the RICO Act, and declining to exercise supplemental jurisdiction over the state law claims. (Filing No. 57). The Plaintiffs filed two Motions to Vacate and Set Aside Judgment (Filing Nos. 59 & 62). The Court denied both motions. (Filing Nos. 61 & 64). The Plaintiffs did not file a direct appeal.



Trust Company and Saffa administer trusts located in Oklahoma. (Filing No. 70 Declaration of James Milton at ¶ 4)[1]. After Defendants sought instructions on July 1, 2005, and August 26, 2005, from the District Court of Tulsa County regarding the administration of these trusts, the Court entered orders approving certain real-estate sales by the District Court of Tulsa County. (Milton Decl. at ¶ 4-5). Plaintiff, Stephen Wallace, was a party to the proceedings in which these real estate sales were approved. Wallace appealed the orders to the Oklahoma Court of Appeals. (Milton Decl. at ¶ 6 Exh. 4 & 5). On December 22, 2006, the state court orders approving the real estate sales were affirmed by the Oklahoma Court of Civil Appeals. (Milton Decl. at ¶ 11, Exh. 7). On March 26, 2007, the Oklahoma Supreme Court issued mandates affirming both appeals. (Milton Decl. at ¶ 11 Ex 9 & 10).

On December 29, 2006, eleven days after this Court dismissed Plaintiffs' complaint, Plaintiff, Edith Jackson, recorded a notice of lis pendens in the Tulsa County land records, stating that she "has filed a Federal lawsuit in the U.S. District Court for the District of Nebraska in Case No. 4:06cv3214 involving her claims and interest in the following properties." Plaintiff went on to identify the properties involved in the state court actions. (Milton Decl. at ¶ 10 Exh. 6).

## DISCUSSION

### I.   Defendants' Motion for Discharge of Lis Pendens

The Defendants request that the Court enter an order releasing and discharging the lis pendens filed by Edith Jackson. Plaintiffs Jackson and Wallace filed separate

---

[1]Hereafter referred to as Milton Decl.

2

objections to the Defendants' motion.   The objections were not responsive to the Defendants' allegations and failed to assert any reason why Plaintiff Jackson filed a notice of lis pendens eleven days after the dismissal of this case.

"The cancellation of the notices of lis pendens [is] no more than enforcement of the court's judgment" and "district court retains jurisdiction to 'enforce its judgment so long as the judgment has not been stayed or superseded.'" *American Town Center v. Hall 83 Assocs.*, 912 F.2d 104, 110-111 (6th Cir. 1990).

Oklahoma law applies to the release or cancellation of a lis pendens on real property located in Oklahoma. *White v. Wensauer*, 702 P.2d 15 (1985 Okla.).   The recording of a lis pendens is governed by Okla. Stat. tit. 12, § 2004.2.[2]  On its face, the statute does not provide for the release or discharge of the lis pendens. However, the Oklahoma Supreme Court explained in *White* that:

> the doctrine of lis pendens is...subject to equitable principles. If the operation of lis pendens should prove harsh or arbitrary in some particular instance, equity can and should refuse to give it effect...Because Oklahoma's statutory scheme does not expressly provide the legal norms that govern in a proceeding to discharge notice of lis pendens, we hold that the trial court must balance the equities to determine whether, in a particular case, the application of the doctrine is harsh or arbitrary and whether cancellation of lis pendens would result in prejudice to the nonpetitioning party.

*White*, 702 P.2d at 18.

---

[2]The statute states:
  Upon the filing of a petition, the action is pending so as to charge third persons with notice of its pendency. While an action is pending, no third person shall acquire an interest in the subject matter of the suit as against the prevailing party's title; except that: action, is filed of record in the office of the county clerk of the county wherein the land is situated
Okla. Stat. tit. 12, § 2004.2(A)(1).

3

The Defendants argue that operation of the lis pendens is harsh or arbitrary because it threatens to disrupt real-estate sales that were approved by the state trial court and affirmed on appeal. The Defendants' argument is persuasive. Continued operation of the lis pendens would serve only to stymie the rulings by the Oklahoma courts. Furthermore, cancellation of the lis pendens would not prejudice the Plaintiffs. The Plaintiffs had every opportunity to fully litigate their claims against the Defendants. On July 1, 2005, and August 26, 2005, the District Court of Tulsa County entered orders approving the real-estate sales by the District Court of Tulsa County. Stephen Wallace was a party to these proceedings. The Oklahoma Court of Civil Appeals affirmed these orders. The Oklahoma Supreme Court issued mandates ordering enforcement of the lower court rulings. And, in fact, the doctrines of claim preclusion and issue preclusion prevent the Plaintiffs from attempting to re-litigate the judgments rendered by the Oklahoma Courts. See Kapp v. Naturelle, Inc., 611 F.2d 703, 707 (8th Cir. 1979) (stating that "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action") and Simmons v. O'Brien, 77 F.3d 1093, 1095 (8th Cir. 1996) (stating that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case"). Accordingly, because I find that continued operation of the lis pendens is harsh and that its cancellation would not prejudice the Plaintiffs, the Defendants' Motion to Release the Lis Pendens is granted.

## II.   Defendants' Motion for an Award of Attorney's Fees and Injunction

The Defendants move for an award of attorney's fees against Plaintiff Edith Jackson pursuant to 28 U.S.C. § 1927, or in the alternative under the inherent power of the court.

4

28 U.S.C. § 1927 states:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Several courts of appeals have considered whether 28 U.S.C. § 1927 applies to pro se litigants. *See, e.g. Wages v. I.R.S.*, 915 F.2d 1230, 1235-36 (9th Cir.1990), cert. denied, 498 U.S. 1096 (1991)) (holding that § 1927 is applicable to pro se plaintiffs); *see also Brown v. Adidas Int.*, 938 F. Supp. 628 (S.D. Cal.1996) (holding that § 1927 is applicable to pro se plaintiffs); *contra Sassower v. Field*, 973 F.2d 75, 80 (2nd Cir.1992) (emphasis added), cert. denied, 507 U.S. 1043 (1993)(holding that pro-se litigants are not included within the phrase "other person admitted to conduct cases" in § 1927); *Meadowbriar Home for Children, Inc. v. G.B. Gunn*, 81 F.3d 521, 535 (5th Cir.1996) (holding that § 1927 applies not to parties but rather to the parties' attorneys); *see also Alexander v. U.S.*, 121 F.3d 312, 316 (7th Cir.1997) (noting circuit split on whether § 1927 applies to pro se litigants and deciding to impose sanctions under court's inherent powers).

The Eighth Circuit Court of Appeals has not considered the applicability of 28 U.S.C. § 1927 to pro se litigants, however, this Court will follow the approach of the Ninth Circuit Court of Appeals and apply the statute to pro se litigants. In the alternative, the Court will assess fees against the Plaintiff pursuant to the inherent power of the court. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (holding that a court may assess attorney's fees when a party has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258-259 (1975)

(*quoting F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129 (1974))).

Plaintiff Jackson filed the notice of lis pendens eleven days after a Memorandum and Order dismissing this action was entered. The Plaintiff was clearly aware that the action was dismissed, and the filing of the notice of lis pendens was a bad faith attempt to oppress the Defendants and circumvent judgments entered by the Tulsa Oklahoma District Court, the Oklahoma Court of Civil Appeals, and this Court. Moreover, the record in this case shows that this is not an isolated incident, rather, the Plaintiffs in this action have had a long history of using the courts in bad faith to harass the Defendants.[3] Therefore, I find that the Defendants shall be awarded their attorney's fees in bringing this motion before the Court. Furthermore, the Court will grant Defendants' request for an injunction and enjoin the Plaintiffs from filing any document, including any lis pendens notice, with any governmental office wherever situated concerning any purported claim, lien, right, title or other asserted interest, arising out of or relating to this case, in any real property.

---

[3]On June 17, 2004 the U.S. District Court for the Northern District of Oklahoma entered a sanctions order against Plaintiff Wallace that among other things, imposed filing restrictions upon him for the purpose of preventing "the further filing of frivolous or malicious actions by Wallace." (Filing No. 40 Exhibit 21). Similar filing restrictions were entered against Wallace in the U.S. Bankruptcy Court for the Northern District of Oklahoma. *In re Wallace*, 288 B.R. 139, 148-49 (Bankr. N.D.Okla. 2002). Plaintiff currently has three actions pending in the U.S. District Court for the District of Columbia involving the trustees in this case, attorneys and various state court judges. (Filing No. Exhibit 5, 30, & 31). Further, On April 21, 2004 the District Court of Tulsa County entered a Temporary Restraining Order prohibiting Wallace from recording documents in the nature of lis pendens regarding trust property. (Milton Decl. at ¶ 12 Ex. 11).

THEREFORE, IT IS ORDERED:

1.      That the Defendants' Motion to Release or Discharge Lis Pendens, Award of Attorney's Fees and for an Injunction (Filing No. 69) is granted;

      i.      The Defendants are given until August 16, 2007 to file their application for expenses and fees;

      ii.     The Plaintiff is given until August 24, 2007 to file her response to the application for fees; and

      iii.    Based on these submissions, the Court will enter an order awarding the Defendants their attorney's fees and expenses.

2.      The Plaintiffs Stephen Wallace and Edith Jackson are enjoined from filing any document, including any lis pendens notice, with any governmental office wherever situated concerning any purported claim, lien, right, title or other asserted interest, arising out of or relating to this case, in any real property;

3.      That Plaintiff Stephen Wallace's Objection to the Motion (Filing No. 72)is denied; and

4.      That Plaintiff Edith Jackson's Motion to Strike Reply Brief (Filing No. 75) is denied.

DATED this 1st day of August, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

7